**VALLEY PRODUCTS CO., INC., Plaintiff,**

v.

**LANDMARK, A Division of Hospitality Franchise Systems, Inc.; Hospitality Franchise Systems, Inc.; Marietta Corporation; Guest Supply, Inc.; Days Inns of America, Inc.; Howard Johnson Franchise Systems, Inc.; Ramada Franchise Systems, Inc.; Super 8 Motels, Inc.; Park Inns International, Inc.; and TM Acquisition, Inc., Defendants.**

**B.N.P. INDUSTRIES, INC. d/b/a Savannah Soaps, Plaintiff,**

v.

**HFS PURCHASING SERVICES f/k/a Landmark, Defendants.**

Nos. 94–2618–TUBRE, 94–2824–TUBRE.

United States District Court, W.D. Tennessee, Western Division.

Dec. 22, 1994.

John J. Thomason & Buckner Wellford, Thomason, Hendrix, Harvey, Johnson & Mitchell, Jerome A. Broadhurst, Harkavy, Shainberg, Kosten & Pinstein, Memphis, TN for plaintiff in No. 94–2618–TUBRE.

David Wade, Martin, Tate, Morrow & Marston, P.C., Memphis, TN, Marc P. Seidler, Fredric A. Cohen, Rudnick & Wolfe, Chicago, IL, Allen T. Malone, Apperson, Crump, Duzane & Maxwell, Memphis, TN, Martin P. Michael, Rubin, Baum, Levin, Constant & Friedman, P.C., New York City, J.

Brooke Lathram, David J. Harris, Burch, Porter & Johnson, Memphis, TN, David Wawro, Haythe & Curley, New York City, for defendants in No. 94–2618–TUBRE.

Patrick T. O'Connor & Patricia T. Paul Oliver, Maner & Gray, Savannah, GA, for plaintiff in No. 94–2824–TUBRE.

Marc P. Seidler & Fredric A. Cohen, Rudnick & Wolfe, Chicago, IL, Allen T. Malone, Apperson, Crump, Duzane & Maxwell, Memphis, TN, Martin P. Michael, Rubin, Baum, Levin, Constant & Friedman, P.C., New York City, J. Brooke Lathram & David J. Harris, Burch, Porter & Johnson, Memphis, TN, David Wawro, Haythe & Curley, New York City, for defendants in No. 94–2824–TUBRE.

## ORDER ON MOTIONS TO DISMISS AND MOTIONS TO AMEND COMPLAINTS

TURNER, District Judge.

## I. *INTRODUCTION*

Plaintiff Valley Products Co., Inc. ("Valley") filed this antitrust complaint pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Tennessee Code Annotated § 47–25–101 (1988) (unlawful restraint of trade), and Tennessee Code Annotated § 47–50–109 (1988) (tortious interference with contract), against Hospitality Franchise Systems, Inc. ("HFS"), Guest Supply, Inc. ("Guest"), and Marietta Corporation ("Marietta").[1] Plaintiff B.N.P. Industries, Inc. d/b/a Savannah Soaps ("Savannah") filed a similar action against the same

defendants[2] also pursuant to the identical federal antitrust laws, as well as Article III, Section IV, ¶ 5 of the Georgia Constitution (1983) and *Ga. Code Ann.* § 13–8–2(a)(2) (Michie 1990).[3] On the motion of the plaintiffs, the court consolidated these cases by order dated November 7, 1994. Presently before the court are the defendants' motions to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).[4]

## II. *RELEVANT FACTS*[5]

Plaintiff Valley is engaged in the business of manufacturing and distributing soap and other hotel amenity items, while plaintiff Savannah is engaged solely in the manufacturing and distribution of soap products. The defendants Guest and Marietta are guest amenity manufacturers that compete with Valley and Savannah in the hotel amenities market. Defendant HFS is a hotel franchising company which owns, through its subsidiaries, the franchising and trademark licensing rights to Days Inns of America, Inc., Ramada Franchise Systems, Inc., Howard Johnson Franchise Systems, Inc., Super 8 Motels, Inc. and Park Inns International, Inc. Franchisees of the HFS system comprise approximately twenty-five percent of the entire hotel franchising market.

At issue in this case is the access of the plaintiffs, hotel amenity manufacturers, to the large and potentially profitable HFS franchise market. The plaintiffs allege that:

> [The] HFS franchise agreements presently require that the franchise operator purchase guest amenities described in this complaint only from "approved suppliers."

---

1. Other subsidiaries of HFS are also named as defendants in the complaint. For purposes of this order these subsidiaries are included within the term HFS.

2. Although at one time Buckhead America Corporation was a defendant to the action brought by Savannah Soaps, and Days Inns of America, Inc. was not a party to that action, Buckhead has since been dropped and Days Inns added by court order. Thus, the defendants in the Valley and Savannah cases are now identical.

3. Savannah's case was filed in the Southern District of Georgia and later transferred to this court.

4. Guest did not file a motion to dismiss under Rule 12(b)(6) but instead filed a Rule 12(c) motion for judgment on the pleadings and an answer. In both its motion and answer Guest asserted the defense of failure to state a claim, a defense virtually identical to that raised in the two motions to dismiss, and all parties have dealt with it accordingly. This order shall constitute the court's ruling on Guest's defense of failure to state a claim to the same extent as the motions to dismiss.

5. The relevant facts are taken from the complaints and proposed amended complaints.

HFS requires that many such amenities, including soap, shampoo, . . . [etc.] bear a trademark or service logo approved by HFS and/or a logo which identifies HFS [hereinafter "logoed amenities"].

Pls.' Compl. and proposed Am.Compl. ¶ 24.[6] To gain access to the logoed amenities market, manufacturers must attain approved vendor status from HFS. Up until July 1994, HFS licensed six manufacturers, including the two plaintiffs, to produce logoed amenity items for its franchisees. These manufacturers were granted that privilege pursuant to a nonexclusive "Approved Vendor" contract executed by HFS. To be an Approved Vendor, prospective manufacturers had to satisfy certain specifications and standards with respect to the quality of the manufactured products. HFS entered into such an Approved Vendor agreement with Valley in May 1992, and with Savannah in March 1993. Those contracts provided that either party could terminate the contract on sixty days advance written notice.

Sometime during 1994 HFS decided to change its policy and only license two manufacturers to produce HFS logoed amenity products. Invoking the sixty-day termination clause in similar letters, both dated July 5, 1994, plaintiffs were notified by HFS that their Approved Vendor status would be terminated as of September 15, 1994, and that they would be prohibited from manufacturing, selling, or distributing amenity items bearing the HFS logo or chain logos. Both Valley and Savannah were advised that the terminations of their respective contracts were not related to the quality of their product, but instead to a management decision taken by HFS to license only two manufacturers. Plaintiffs allege that if they are "prohibited from manufacturing, selling or distributing amenity items bearing the HFS and chain logos, [they] will be effectively prevented from serving the HFS franchisees." Pls.' Compl. and proposed Am.Compl. ¶ 31. The

only two manufacturers selected by HFS as its remaining "Approved Vendors" were co-defendants Guest and Marietta.

In return for granting Guest and Marietta this "Preferred Vendor" status, and "the exclusive right to sell products containing the chain logo and/or HFS logo," Pls.' Compl. and proposed Am.Compl. ¶ 39, their respective contracts provide that significant "up front" fees will be paid to HFS, and that HFS will also receive commissions on sales to franchisees. To protect the integrity of the "Preferred Vendor" contract, HFS has now instituted a requirement—that the HFS logo be imprinted on all guest amenity products so that the origins of those products can be easily identified. Plaintiffs allege that the logo requirement is enforced by HFS.[7] Because Valley and Savannah no longer have permission to use the HFS logo, they cannot sell their amenity products to HFS franchisees.

Plaintiffs' theory as alleged in this case is based on the illegality of tying arrangements under federal antitrust law, where a seller conditions the sale of a desirable item (i.e., the tying product) on the purchase of an undesirable item (i.e., the tied product). Plaintiffs argue that the defendants, through a series of illegal agreements and conduct, have "tied" the purchase of logoed hotel guest amenity items to continued access to the HFS franchise. Alternatively, plaintiffs contend that the tying product can be considered the guest amenity items themselves and the tied product the supposedly worthless HFS logo. Accordingly, plaintiffs ask the court to enjoin HFS from prohibiting the plaintiffs from using the HFS logo and chain trademark or servicemark on soap and hotel guest amenity products manufactured by them. In the alternative, plaintiffs request that the court mandate that the "Approved Vendor" agreement between the plaintiffs

---

6. Similar allegations appear in Savannah's pleadings.

7. More specifically, the language of the proposed amended complaint provides that:

[i]n the event that any franchisees failed to utilize the HFS logo, which HFS now permits only Marietta and Guest Supply to affix to the guest amenity items, the franchisees could be subjected to a wide variety of penalties including, but not limited to, forfeiture of the franchise.

Pls.' proposed Am.Compls. ¶ 39.

and HFS remain in full force and effect.[8] Plaintiffs also seek monetary damages under the federal antitrust statutes.

### III. *LEGAL STANDARD*

Defendants argue that the complaint against them should be dismissed for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The purpose of a Rule 12(b)(6) motion is to test the sufficiency of the pleadings. *Davis H. Elliot Co. v. Caribbean Utilities Co.*, 513 F.2d 1176, 1182 (6th Cir.1975). When considering such a motion, the court is required to liberally construe the complaint and take its well-pleaded facts as true. *Id.* The motion "should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

#### A. *Antitrust Standing*

■ The court will begin by addressing defendants' contention that the action should be dismissed because plaintiffs have not successfully demonstrated that they have antitrust standing. Because an antitrust standing and injury analysis presumes that the plaintiffs have set out an antitrust violation, it is properly dealt with on a motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(6).

■ Section 4 of the Clayton Act provides a private remedy for antitrust violations, and states in relevant part:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee.

15 U.S.C. § 15.[9]

Although the breadth of the Clayton Act language appears to grant a private remedy to "any person injured by the antitrust laws," such an expansive reading has not been adopted by the Supreme Court. *See e.g., Cargill, Inc. v. Monfort of Colorado*, 479 U.S. 104, 109–110, 107 S.Ct. 484, 488–89, 93 L.Ed.2d 427 (1986). Rather, over the past two decades the Supreme Court has narrowly defined the proper plaintiff under the Clayton Act by formulating a particularized antitrust standing requirement. *See generally* Anthony E. DiResta, Bryan G. Harrison & William M. Reid, *"Antitrust Injury": The Substantive and Procedural Impact of Brunswick*, C695 ALI–ABA 211 (1991). Currently, an antitrust plaintiff must allege both constitutional and "special" antitrust standing to survive a motion to dismiss. *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1234 (6th Cir.1981); *Hodges v. WSM, Inc.*, 26 F.3d 36, 38 (6th Cir.1994).

■ Antitrust standing involves a two-step inquiry. *Todorov, M.D. v. DCH Healthcare Authority*, 921 F.2d 1438 (11th Cir.1991). First, the plaintiff must demonstrate that its harm falls within the legal definition of "antitrust injury". *Id.* Antitrust injury is defined as "injury which reflects the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Only if the court finds that plaintiff has successfully demonstrated such injury, must the court then decide whether the plaintiff has specific anti-

---

8. *See* Valley's Compl. and proposed Am.Compl. ¶ 66 and Savannah's proposed Am.Compl. ¶ 72.

9. Sections 4 and 16 of the Clayton Act function as the private enforcement provisions for claims brought under federal antitrust law. *Cargill, Inc. v. Monfort of Colorado*, 479 U.S. 104, 109, 107 S.Ct. 484, 488–89, 93 L.Ed.2d 427 (1986). Section 4 of the Clayton Act provides for money damages, while Section 16 affords injunctive relief. Although antitrust standing is required to state a claim under all provisions of federal antitrust law, "the source of the antitrust injury requirement" lies in Section 4 of the Clayton Act. *Id.* Therefore, for purposes of this motion to dismiss, the court will focus on an analysis of that section. However, the court's findings with respect to antitrust standing apply to all provisions of federal antitrust law raised in conjunction with the matter before the court.

trust standing to sue. *Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197, 1201 (7th Cir.1986). The standing component of the analysis involves a determination as to whether or not the plaintiff is the proper and most efficient party to bring the action. *See generally* William Page, *The Scope of Liability for Antitrust Violations,* 37 Stan.L.Rev. 1445, 1503 (1985).

■ Therefore, the first question before the court on the motion to dismiss is whether, assuming the plaintiffs have violated the antitrust laws, that violation caused antitrust injury. The Supreme Court first identified the concept of antitrust injury in the landmark case of *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In *Brunswick,* the Supreme Court held that private plaintiffs alleging antitrust injury had to prove more than that they were simply harmed by an antitrust violation, but also had to prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* at 488–89, 97 S.Ct. at 697–98. In so holding, the Court recognized a substantive causation element in antitrust claims, analogous to the notion of proximate cause in tort actions. *See Jack Walters & Sons Corp. v. Morton Bldgs., Inc.*, 737 F.2d 698, 708–09 (7th Cir.1984), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984) (Judge Posner noting that *Brunswick* illustrates the "application to the antitrust law of venerable principles of tort causation."). *Brunswick* and its progeny require a private antitrust plaintiff to prove more than a "but/for" connection between the alleged violation and the harm; the plaintiffs must also show legal causation. *The Scope of Liability for Antitrust Actions*, at 1462–63. Thus, before evaluating an antitrust claim on its merits, *Brunswick* compels the federal courts to require a threshold showing that plaintiffs' alleged damages fall within the scope of antitrust injury.

The two most relevant Sixth Circuit applications of the *Brunswick* rule to the matter before the court can be found in *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir.1989),

and *Hodges v. WSM, Inc.*, 26 F.3d 36 (6th Cir.1994).

In *Axis,* a European manufacturer of a special type of machine that was sold by only four firms in the United States brought an action challenging a European competitor's acquisition of two of the four American firms. The plaintiff manufacturer contended that the defendant's anticompetitive activity barred it from the American market by substantially reducing competition. The two American firms selling the machines owned the patents for the equipment necessary to manufacture the machines. Because those two firms refused to license the patents to the plaintiff so it could operate in the United States, the plaintiff brought suit under federal antitrust law. The *Axis* court held that no antitrust injury existed because it found that plaintiff's exclusion from the United States market was caused by defendant's refusal to license its patents to plaintiff and not by the alleged anticompetitive activity.

In *Hodges*, 26 F.3d 36 (1994), the plaintiff owned an airport shuttle company and a sightseeing tour service. The defendant, WSM, owned Grand Ole Opry Tours, Inc. and Opryland USA, Inc. WSM entered into an agreement with plaintiff's competitors, other shuttle service companies, whereby WSM would hire vans and buses from these companies, and in return the companies would stop transporting customers between the airport and the Opryland complex. Plaintiff alleged that this arrangement was an illegal conspiracy that deprived it of the opportunity to compete in the airport shuttle transportation market. The court granted WSM's motion to dismiss on the grounds that plaintiff failed to demonstrate antitrust injury. Specifically the court held that:

> Plaintiff's injury, in this case, was caused by the lawful refusal of Opryland to permit the Plaintiff to enter its property, not by Plaintiff's participation in an alleged illegal market division conspiracy. Plaintiff's injury did not flow from any decrease in competition among the allegedly conspiring shuttle operators, rather it flowed from the Defendant's act of refusing to allow the Plaintiff on their private property.

*Id.* at 38.

The *Hodges* court further clarified its holding by explaining that "[i]f plaintiff would have suffered the same injury without regard to the allegedly anticompetitive acts of Defendants, Plaintiff has not suffered antitrust injury." *Id.*

### i. *Original Complaints*

Plaintiffs' first theory of the case, as alleged in their original complaints, was that the anticompetitive violation was the illegal tie between continued access to the HFS franchise (the tying product), and the logoed guest amenity items (the tied product). The original complaints aver that the HFS franchise agreements require that the "franchise operator purchase guest amenities described in this Complaint only from "approved suppliers," and that many of these amenities (i.e. soap, shampoo, etc.) must "bear a trade or service logo approved by HFS." Compl. ¶ 24. In that same paragraph, plaintiffs assert that the HFS franchise agreements represent that "the ability of a supplier to become 'approved' is determined by the supplier's ability to satisfy the product quality specifications that HFS periodically provides." *Id.* Because plaintiffs contend they can meet the product quality specifications set forth in HFS's franchise agreements, they argue they should be approved suppliers. The complaints, taken as a whole, contend that the illegal tie between guest amenities and the continued access to the franchise has kept them off the list and restricted their access to the HFS franchise amenities market.

█ Like the plaintiffs in *Axis* and *Hodges,* the plaintiffs' injury in this case was caused by HFS's decision to license only a limited number of manufacturers, in which neither Valley nor Savannah is included. Although plaintiffs were understandably hurt by that decision, their injury flows from the fact that plaintiffs were not chosen to be preferred vendors and that they were removed from the approved supplier list, but not from any anticompetitive activity. More specifically, plaintiffs' exclusion from access to defendants' license, and their resulting inability to produce logoed amenities, is what

has caused them harm, not their exclusion based on the illegal tie. The plaintiffs would have suffered the identical loss if their contracts with HFS had simply been terminated, even if no preferred vendor agreement with Guest and Marietta existed. Moreover, even if there was no tie, plaintiffs still could not sell the HFS logoed amenity items. Thus, even absent the alleged antitrust violation, plaintiffs' injury remains the same. It follows, therefore, that if plaintiffs were harmed, it was not "by reason of anything forbidden in the antitrust laws." *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697. While plaintiffs' damages occurred by reason of the alleged illegal preferred vendor agreements (i.e., restricted access to HFS' trademark), they did not occur by reason of that which supposedly made the agreements unlawful (i.e., the tie).

█ As both *Axis* and *Hodges* affirmed, HFS as holder of its trademark is within its legal rights to deny use of the HFS logo to plaintiffs, and to refuse to certify plaintiffs as approved vendors, even though that denial may have the unfortunate effect of excluding plaintiffs from the HFS guest amenity market. *See Hodges,* 26 F.3d at 39 (discussing *Axis* ) ("The holders of the patents, of course, were within their rights to deny use of the patents to a potential competitor, even though the *result* of their conduct was to exclude the competitor from the market.") (emphasis in original). Further, even if HFS *was* illegally denying plaintiffs access to its trademarks, plaintiffs would still not have antitrust injury, even though they might have a valid claim under an alternative legal theory. It is a well-settled legal principle that the "antitrust laws were enacted to protect competition not competitors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

The lost profits that plaintiffs complain of are attributable to HFS's termination of the approved vendor agreements between the plaintiffs and HFS and not by any reduction in competition among hotel amenities manufacturers. *See Zenith Radio Corp v. Hazeltine Research,* 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969) ("The injury should reflect the anticompetitive effect

either of the violation or of anticompetitive acts made possible by the violation."); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342, 110 S.Ct. 1884, 1893, 109 L.Ed.2d 333 (1990) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."). Because Valley's and Savannah's injuries do not result from a decrease in competition in the marketplace, but rather from the termination of their respective contracts, the court finds that there is no antitrust injury showing in plaintiffs' original complaints. *See Hodges,* 26 F.3d at 39 ("Because plaintiffs [do] not allege, nor could they, that the illegal antitrust conduct was a necessary predicate to their injury or that defendants could exclude plaintiffs only by engaging in the antitrust violation, it was appropriate to dismiss the case. . . ."). Even without the tie, HFS could still prevent plaintiffs' access to its franchise market by not approving plaintiffs as suppliers from whom franchisees are authorized to buy their guest amenities. Thus, plaintiffs' injury was not caused by the alleged antitrust violation.

### ii. *Proposed Amended Complaints*

The court denies plaintiffs' motions to amend their complaints on the grounds that such amendments would be futile. *See Neighborhood Development Corp. v. Advisory Council on Historic Preservation,* 632 F.2d 21, 23 (6th Cir.1980) (where a proposed amendment would not survive a motion to dismiss, the court need not permit the amendment).

■ Plaintiffs' proposed amended complaints assert, in the alternative to the original complaints, that the illegal tie is between the amenity product itself (the tying product) and the supposedly worthless HFS logo (the tied product). Plaintiffs' amended complaints provide that HFS's agreement with its franchisees requires that the franchisees purchase guest amenities from approved suppliers. Neither Valley nor Savannah ever

questioned the right of the defendants to limit the number of guest amenity vendors when they were on that approved vendor list. Plaintiffs only challenge that right now that they are eliminated from that list. Thus, plaintiffs' injury here does not inure from the alleged tie of the guest amenity products to the HFS logo, but instead from the fact that plaintiffs did not make HFS's "short list."

Even if this court held that HFS was prohibited from requiring the HFS logo on guest amenities, plaintiffs' injury would be the same. As noted, the proposed Amended Complaint alleges that the "HFS franchise agreements presently require that the franchise operator purchase guest amenities described in the complaint only from 'approved suppliers'." Pls.' Compl. and proposed Am. Compl. ¶ 24. Plaintiffs would still be precluded from selling their amenities to HFS franchisees, even without the HFS logo requirement, because they would still not be approved suppliers—they would still be "off the list." Therefore, that required nexus—the crucial causal connection between the antitrust violation and plaintiffs' injury, does not exist under the alternative theory.

Because the court has found that plaintiffs' have not established that their harm is of the sort the antitrust laws were designed to prevent, the court need not reach the second prong of the standing analysis. Without antitrust injury plaintiffs do not have standing to bring this action under federal antitrust law. Accordingly, HFS's motion to dismiss on the federal antitrust claims is granted.[10] This leaves the Tennessee state claims and the Georgia state claims for the court to address.

### B. *Valley's Tennessee State Claims*

#### i. *Tenn.Code Ann. § 47–25–101: Unlawful Restraint of Trade*

■ The Tennessee antitrust statute pertains to transactions that are predominantly intrastate in character. *Lynch Display Corp. v. National Souvenir Center, Inc.,*

---

**10.** For purposes of clarity, plaintiffs' Count 5 Lanham Act claim is also dismissed because that claim is contingent on the success of the Sherman and Clayton Act federal antitrust claims.

Because the federal antitrust claims fail for lack of antitrust injury, the Lanham Act claim must also be dismissed.

640 S.W.2d 837, 840 (Tenn.App.1982). Although the dispute need not be *exclusively* intrastate to fall within the statute, it must more than incidentally affect intrastate commerce. *Id.* The matter before the court clearly involves significant interstate commerce and activity and only minimally affects intrastate commerce. HFS franchisees are located in every state in the country and the sale of guest amenities necessarily implicates many different geographic regions. Therefore, the court grants defendants' motions to dismiss on the Tennessee state antitrust claim.

ii. *Tenn.Code Ann. § 47–50–109: Tortious Interference with Contract*

■■■ Count 1 of Valley's complaint asserts a claim for intentional interference with contract or prospective economic advantage pursuant to section 47–50–109 of the Tennessee Code. Valley's theory is that defendants' alleged illegal antitrust activity interferes with Valley's business relationship with its distributors because it can no longer sell guest amenities to its distributors. The relevant statute, *Tenn.Code Ann. § 47–50–109*, clearly states that it is "the party injured by such breach [who] may bring suit for the breach." *Id.* Thus, only the injured party has standing to sue for intentional interference with contract. *See Oak Ridge Precision Industries, Inc. v. First Tennessee Bank Nat'l Ass'n*, 835 S.W.2d 25, 29 (Tenn. App.1992) (holding proper party to bring suit under statute is contracting party injured by breach, not breaching party). Here, the Valley distributors are the ones who will be injured by the breach and are therefore the proper parties to bring suit. Therefore, the court grants defendants' motions to dismiss on this claim.

■■■ Valley has also stated a claim for intentional interference with prospective economic advantage. The Tennessee courts have never recognized a claim for intentional interference with prospective economic advantage. *See Chilton Air Cooled Engines, Inc. v. Omark Industries, Inc.*, 721 F.Supp. 151, 156 (M.D.Tenn.1988) (finding that Tennessee has not developed any case law concerning interference with prospective business relations). Nevertheless the Tennessee courts have also never expressly rejected such a cause of action. *See Quality Auto Parts v. Bluff City Buick*, 876 S.W.2d 818, 823–24 (Tenn.1994) ("We conclude that the question of whether Tennessee law recognizes the tort of intentional interference with prospective economic advantage should be postponed to another day....."). However, because a claim for prospective interference with contract does not presently exist under Tennessee law, this court declines to create a new cause of action. *See Chilton Air*, 721 F.Supp. at 156 (dismissing claim because "Tennessee has not recognized tort of interference with prospective business relations."). Accordingly, the motions to dismiss with respect to the prospective interference with contract claim are granted.

## C. *Georgia State Claims*

Savannah has also alleged violations of Georgia state law pursuant to Art. III., § VI, ¶ 5(c) of the Georgia Constitution [11] and *Ga. Code Ann. § 13–8–2(a)(2)*.[12] These two provisions have been construed by the Georgia Supreme Court to confer similar rights. *Griffin v. Vandegriff*, 205 Ga. 288, 53 S.E.2d 345, 348 (1949) ("It is apparent that this court considered the constitutional provision to mean precisely the same thing which the Code Section has been construed to mean.").

■■■ Savannah's argument is that defendants' preferred vendor agreements restrict competition in the guest amenity market and

---

11. *Ga. Const.* Art. III, § 6, ¶ 5 (1983) provides: The General Assembly shall not have the power to authorize any contract or agreement which may have the effect of or which is intended to have the effect of defeating or lessening competition, or encouraging a monopoly, which are hereby declared to be unlawful and void.
 *Id.*

12. *Ga.Code Ann. § 13–8–2(a)(2)* (Michie 1990) states in relevant part:

 (a) A contract which is against the policy of the law cannot be enforced. Contracts deemed contrary to public policy include but are not limited to: ...

 (2) Contracts in general restraint of trade....
 *Id.*

thus must be declared unenforceable under Georgia law. Georgia law does recognize, both in its Constitution and statutory law, a strong public policy against contractual restrictions on competition and trade. *Atlanta Center Ltd. v. Hilton Hotels Corp.,* 848 F.2d 146, 148 (11th Cir.1988).

 Defendants cite *Palmer v. Atlantic Ice & Coal Corp.,* 178 Ga. 405, 173 S.E. 424 (1933), for the proposition that in order to have standing to bring these claims under Georgia law, Savannah must be a party to the alleged illegal contract or agreement. In *Palmer,* the plaintiff's competitors allegedly conspired to drive him out of the ice selling business and plaintiff brought suit contending that this conspiracy amounted to an illegal contract in restraint of trade. The *Palmer* court held that plaintiff did not have standing to maintain a suit because he was not a party to the allegedly illegal contract. This standing principle, as it applies to illegal contracts in restraint of trade, has not been subsequently modified by Georgia law. Therefore, the court finds that Savannah, because it was not a party to the allegedly illegal preferred vendor agreements, does not have standing to bring suit on its Georgia state claims. Accordingly, the court grants defendants' motions to dismiss on those claims.

### CONCLUSION

For the reasons articulated above, the plaintiffs' motions to amend the complaints are denied and defendants' motions to dismiss are hereby granted.

IT IS SO ORDERED.