**VALLEY PRODUCTS COMPANY, INC., Plaintiff–Appellant,**

v.

**LANDMARK, A DIVISION OF HOSPITALITY FRANCHISE SYSTEMS, INC., et al., Defendants–Appellees.**

Nos. 95–5206, 95–5235.

United States Court of Appeals, Sixth Circuit.

Argued May 13, 1996.

Decided Oct. 22, 1997.

Buckner P. Wellford (argued and briefed), John J. Thomason (briefed), Thomason, Hen-

drix, Harvey, Johnson & Mitchell, Memphis, TN, Jerome A. Broadhurst (briefed), Harkavy, Shainberg, Kosten & Pinstein, Memphis, TN, for Plaintiff–Appellant.

Fredric A. Cohen (argued and briefed), Scott A. Lefelar and Marc P. Seidler (briefed), Rudnick & Wolfe, Chicago, IL, David Wade (briefed), Martin, Tate, Morrow & Marston, Memphis, TN, for Defendants–Appellees Landmark, Hospitality Franchise Systems, Inc., Days Inns of America, Inc., Howard Johnson Franchise Systems, Inc., Ramada Franchise Systems, Inc., Park Inns International, Inc., TM Acquisitions, Inc.

Allen T. Malone (briefed), Apperson, Crump, Duzane & Maxwell, Memphis, TN, Martin P. Michael (briefed), Rubin, Baum, Levin, Constant & Friedman, New York City, Benjamin E. Rosenberg, Shereff, Friedman, Hoffman & Goodman, New York City, for Defendant–Appellee Marietta Corporation.

David J. Harris, J. Brooke Lathram (briefed), Burch, Porter & Johnson, Memphis, TN, David W. Wawro (briefed), Haythe & Curley, New York City, for Defendant–Appellee Guest Supply, Inc.

Before: NELSON and MOORE, Circuit Judges; CLELAND, District Judge.*

## OPINION

DAVID A. NELSON, Circuit Judge.

This is an appeal from the dismissal of an antitrust case. The plaintiff—a soap manufacturer that had been selling logo-bearing "guest amenities" for use in hotels and motels operated under franchises granted by certain of the defendants—was denied permission to use the franchisors' trademarks after two competing soap manufacturers were granted a "preferred supplier" status denied the plaintiff. Claiming to be the victim of illegal tying arrangements, among other things, the plaintiff sued the franchisors and the favored manufacturers for various types of relief, including treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.

The district court concluded that the plaintiff had not stated a cause of action under the federal antitrust laws, primarily because the plaintiff's factual allegations failed to show the requisite "antitrust injury." See *Valley Products Co., Inc. v. Landmark*, 877 F.Supp. 1087 (W.D.Tenn.1994). We agree with the district court's resolution of this issue. Accordingly, and because we also agree with the district court's disposition of the other issues pressed by the plaintiff on appeal, the dismissal of the lawsuit will be affirmed.

I

Defendant Hospitality Franchise Systems, Inc., or "HFS," is said to be the world's largest franchisor of lodging facilities. Since its start-up in 1990, HFS, acting through subsidiary corporations, has acquired trademark and trade name rights for the Days Inn, Ramada, Howard Johnson, Super 8, and Park Inn hotel-motel businesses. Although HFS owns no hotel properties itself, an affidavit filed by the plaintiff says that franchises issued by HFS cover approximately 12% of the 3.4 million hotel rooms in the United States.[1] Another of the affidavits notes that HFS controls approximately one-fourth of all franchised hotels in the U.S. lodging industry. HFS franchisees enjoy the benefits of a national marketing and reservation system.

Plaintiff Valley Products Co., Inc., manufactures bar soap for sale to commercial distributors. The distributors resell the product to owners and operators of hotels and motels throughout the United States. Valley also contracts for the manufacture of shampoo, hair conditioner, hand/body lotion, and other amenities that go through the same distribution system. Valley's total sales, of which the "hospitality" product line is said to comprise a substantial portion, come to ap-

---

* The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Voluminous affidavits were filed by both sides in connection with preliminary injunction motions. What is now at issue is the legal sufficiency of the complaint itself, but the plaintiff's brief on appeal nevertheless refers to the affidavits repeatedly. These references are defended as providing "the basis for reasonable inferences that may be drawn from the Complaint."

proximately $20 million per year—or did when the complaint was filed.

Among Valley's competitors is defendant Guest Supply, Inc., an integrated manufacturer/distributor of guest amenities and other products. In fiscal year 1993, according to one of its affidavits, Guest Supply's sales came to $97,851,000.

Defendant Marietta Corporation is said to be the second largest independent manufacturer in the guest amenity market. Marietta's total sales for fiscal year 1993 were $65,845,000, of which approximately $38 million came from the sale of guest amenities. Like Valley, Marietta sells its products through commercial distributors.

Defendant HFS acquired the Days Inn Hotel Franchise System in 1992, according to Valley's complaint. Prior to that time, it appears, Valley had been one of two manufacturers authorized to sell soap and other amenities bearing the Days Inn logo. By early 1994 HFS had trebled the number of "approved vendors" authorized to produce and sell such amenities. The six approved vendors—which were also authorized to utilize the logos of other hotel chains for which HFS held trademark rights—were Guest Supply, Marietta, Procter & Gamble, Dial, Valley, and B.N.P. Industries, Inc., doing business as Savannah Soaps. Each of these companies had an HFS "vendor agreement" that was terminable by either party on 60 days' notice.

During the first half of 1994, HFS developed a "Preferred Vendor Program" under which the number of approved original sources for logoed amenities was to be cut back to two. Selected as preferred vendors were defendants Guest Supply and Marietta. Both of these companies contracted to pay fees to HFS for "access" to the HFS system.[2]

Procter & Gamble, Dial, Valley, and Savannah all received notices terminating their vendor agreements in accordance with the terms of those agreements. Valley's termination notice explained that HFS had decided "to establish a long-term relationship with two manufacturers with extensive distribution networks." The notice went on to say that Valley's vendor agreement with HFS would terminate as of September 15, 1994; that "you [Valley] shall cease and desist from manufacture, sale or distribution of any items bearing logos owned or licensed by HFS or its affiliates;" and that the decision to terminate "is in no way a reflection of [sic] the integrity and quality of service and product provided by your company."

Valley's antitrust suit was filed in the United States District Court for the Western District of Tennessee in July of 1994. Savannah subsequently brought a similar action in the United States District Court for the Southern District of Georgia. On motion of the defendants, Savannah's case was transferred to the Western District of Tennessee and consolidated with Valley's.

The theory advanced in the plaintiffs' complaints was that the defendants were violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by attempting to subject HFS franchisees to tying arrangements under which franchise rights were conditioned on purchases of logoed amenities manufactured by Guest Supply and/or Marietta. The plaintiffs also alleged that the defendants were violating Section 2 of the Sherman Act by attempting improperly to leverage the market power of the defendant manufacturers and the monopoly power that HFS possessed over its franchisees' use of the HFS trademarks; that HFS was not entitled to the protection of the trademark laws, the trademarks having been misused; that the conduct of the defendants wrongfully interfered with the plaintiffs' economic or contractual relations with franchisees; and that the challenged conduct was illegal under state antitrust law.

The plaintiffs sought preliminary injunctive relief, and their vendor agreements with HFS were extended to December of 1994 under the aegis of the district court. As we have said, numerous affidavits were filed in

---

2. We pause here to note that the late Professor Areeda took the position that where the defendant is not itself the vendor of the allegedly tied products, but does collect "access fees" from the vendor, courts should not treat the access fees as an economic interest capable of rendering the alleged tie illegal *per se*. See Phillip E. Areeda, *Antitrust Law*, Vol. IX, ¶ 1727d (1991).

connection with the application for preliminary relief.

Responding to a suggestion by the defendants that the absence of a "derivative aftermarket" distinguishes this case from *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)—a decision cited by Valley in support of its principal theory—Valley filed a supplemental affidavit in which one of its expert witnesses advanced an alternative theory that characterized the soap and other amenity products as the "tying good" and the HFS logo as the "tied product." The plaintiffs moved for leave to file amended complaints incorporating this theory, but the defendants opposed the motions on the ground that the amendments would, be futile. The district court agreed with the defendants and dismissed the actions without permitting amendment. The plaintiffs, who filed timely notices of appeal from the dismissal order, have not contended that the district court abused its discretion in denying leave to amend.

Although Savannah filed an appellate brief, it subsequently moved for dismissal of its appeal. The motion was granted, leaving Valley's the only appeal to be decided.

## II

■ The central issue on appeal is one couched by plaintiff Valley in these terms:

"Assuming that the defendants-appellees violated the antitrust laws by coercing HFS franchisees into accepting an unlawful tie-in arrangement, through misuse of HFS' trademarks, have appellants alleged antitrust injury sustained as a result of such coercion?"

■ For reasons to which we shall turn presently, we are not prepared to assume that refusal to permit unauthorized use of HSF trademarks constituted a "misuse" of the trademarks under the antitrust laws. Subject to that reservation, we accept Valley's formulation of the issue with the caveat that the principal assumption we are asked to indulge—*i.e.,* that the HFS Preferred Vendor Program was a tying arrangement proscribed by the antitrust laws[3]—is an assumption only, and one we employ solely for purposes of analysis.

■ If the HFS program did run afoul of the antitrust laws, the question whether the plaintiff's factual allegations demonstrate "antitrust injury" takes on crucial importance. Under the caselaw, it is not enough for the plaintiff to claim economic injury: "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). A loss linked to a *per se* violation of § 1 of the Sherman Act, which is one possible characterization of the loss of business suffered by the plaintiff here, is not compensable in the absence of antitrust injury. *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 335, 110 S.Ct. 1884, 1889–90, 109 L.Ed.2d 333 (1990). And a plaintiff seeking injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 16, must likewise show antitrust injury. *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 111, 107 S.Ct. 484, 489–90, 93 L.Ed.2d 427 (1986). Without antitrust injury, no private antitrust action will lie at law or in equity.

Section 4 of the Clayton Act, 15 U.S.C. § 15—a provision originally enacted as § 7 of

---

**3.** "A tying arrangement is 'an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" ABA Section of Antitrust Law, *Antitrust Law Developments (Fourth)* 173 (1997), quoting *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958) (footnote omitted). The case at bar presents serious questions as to whether the HFS franchise package constitutes a product that is separate and distinct from the logoed amenities, and would thus be capable of serving as a "tying product" for such amenities; whether a 12 percent share of the national hotel market or a 25 percent share of the franchised hotel market could give HFS "market power," the courts having repeatedly held that a 30 percent market share is insufficient to confer the market power without which a tie cannot be illegal *per se;* and whether a tying arrangement illegal *per se* can exist where the defendant is not the vendor of the tied product. See n. 2, *supra.*

the Sherman Act, 26 Stat. 210—authorizes treble damage relief for "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws...." In *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 529, 103 S.Ct. 897, 903–04, 74 L.Ed.2d 723 (1983), the Supreme Court observed that "[a] literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." But Congress clearly intended the Sherman Act to be construed in light of common law rules that historically had imposed significant limits on the right to recover damages in contract or tort. *Id.* at 531–32, 103 S.Ct. at 904–05. In 1890, when the Sherman Act was passed, judge-made doctrines such as foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract often posed formidable barriers to the recovery of damages in actions at common law. And the Congress that passed the Sherman Act "simply assumed that antitrust damages litigation would be subject to constraints comparable to well-accepted common-law rules applied in comparable litigation." *Id.* at 533, 103 S.Ct. at 906.

The antitrust injury doctrine is one such constraint, and an increasingly important one. It has become a mainstay in the rather arcane network of doctrines by which courts, in keeping with the intent of the legislature, have attempted to confine antitrust litigation to "economically rational limits." See W.H. Page, "The Scope of Liability for Antitrust Violations," 37 Stan. L.Rev. 1445, 1446 (1985).

■ Among the factors that we must examine in determining whether antitrust injury exists is "the directness or indirectness of the asserted injury." *Associated General Contractors,* 459 U.S. at 540, 103 S.Ct. at 909. The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation.

In *Axis, S.p.A. v. Micafil, Inc.,* 870 F.2d 1105 (6th Cir.), *cert. denied,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989), this court dealt with a situation where the plaintiff, a European manufacturer of armature winding machines, hoped to get into the business of manufacturing such machines in the United States. The plaintiff found itself foreclosed from entering the U.S. market after the defendant, an American subsidiary of a European competitor, obtained key patents from one American manufacturer and took over a second American manufacturer, a company holding a license to use the patents. Although the defendant's takeover of the latter company was assumed to violate. § 1 of the Sherman Act and § 7 of the Clayton Act, our court did not view the antitrust violation as having inflicted the requisite antitrust injury. The harm of which the plaintiff complained, as the *Axis* panel saw it, was a direct result of the plaintiff's inability to obtain the patents, or a license to use the patents—and this harm did not "flow from" the element of the takeover that created the antitrust problem. *Id.* at 1112, quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697–98.

The plaintiff in *Axis* never became a competitor in the American market, and the panel observed by way of *dictum* that perhaps a competitor could have stated a claim for damages. *Axis,* 870 F.2d at 1111–12. But the plaintiffs in *Hodges v. WSM, Inc.,* 26 F.3d 36 (6th Cir.1994), appear to have been in competition with two of the defendants in that case (Grand Ole Opry Tours and Opryland USA) for a short time prior to the advent of an allegedly illegal market-sharing agreement in the Nashville sightseeing tour and airport shuttle market. We nonetheless held in *Hodges* that the plaintiff shuttle operators could not claim antitrust injury when denied permission to drive their vans past the gates of the defendants' Opryland complex.

"It was Opryland's refusal to allow Plaintiff's vans on its property which caused Plaintiff's injury. If Plaintiff would have suffered the same injury without regard to the allegedly anticompetitive acts of Defendants, Plaintiff has not suffered an anti-

trust injury." *Id.* at 38 (quoting district court opinion).

In other words, as the *Hodges* panel put it, a violation of the antitrust laws was not a "necessary predicate" to the plaintiffs' loss of business:

> "Because plaintiffs did not allege, nor could they, that the illegal antitrust conduct was a necessary predicate to their injury or that defendants could exclude plaintiffs only by engaging in the antitrust violation, it was appropriate to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Id.* at 39.

We do not believe that the plaintiff in the case at bar can pass the "necessary predicate" test. The loss of logoed amenity sales suffered by Valley upon cancellation of its vendor agreement flowed directly from the cancellation, as we see it; the sales losses would have been suffered as a result of the cancellation whether or not HFS had entered into the alleged tying arrangements with the franchisees. Here, as in *Hodges*, the alleged antitrust violation was simply not a necessary predicate to the plaintiff's injury.

This was how the district court saw the matter too:

> "Like the plaintiffs in *Axis* and *Hodges*, the plaintiffs' injury in this case was caused by HFS's decision to license only a limited number of manufacturers, in which neither Valley nor Savannah is included. Although plaintiffs were understandably hurt by that decision, their injury flows from the fact that plaintiffs were not chosen to be preferred vendors and that they were removed from the approved supplier list, but not from any anticompetitive activity. More specifically, plaintiffs' exclusion from access to defendants' license, and their resulting inability to produce logoed amenities, is what has caused them harm, not their exclusion based on the illegal tie. The plaintiffs would have suffered the identical loss if their contracts with HFS had simply been terminated, even if no preferred vendor agreement with Guest and Marietta existed.

> \*    \*    \*    \*    \*    \*

> "As both *Axis* and *Hodges* affirmed, HFS as holder of its trademark is within its legal rights to deny use of the HFS logo to plaintiffs, and to refuse to certify plaintiffs as approved vendors, even though that denial may have the unfortunate effect of excluding plaintiffs from the HFS guest amenity market.

> \*    \*    \*    \*    \*    \*

> "Because Valley's and Savannah's injuries do not result from a decrease in competition in the marketplace, but rather from the termination of their respective contracts, the court finds that there is no antitrust injury showing in plaintiffs' original complaints." *Valley Products,* 877 F.Supp. at 1093–94.

Valley asserts on appeal that the termination of its vendor agreement was not what caused the loss of business of which it complained. We do not find the assertion persuasive. Valley wanted to sell amenity products marked with HFS logos, after all, and a person is not normally free to use another's trademark without a license to do so. Valley's vendor agreement with HFS, a copy of which was attached to the complaint as an exhibit, explicitly provided that upon termination of the agreement in the prescribed manner—and Valley does not deny that the agreement was so terminated—Valley "shall immediately cease and discontinue all use of any of the trademarks...." It would obviously make no sense to suppose that Valley could have continued to sell logoed amenities that bore no logos—and like the district court, we are satisfied that it was the termination of the vendor agreements that caused the harm complained of.

■ Valley argues further that HFS was guilty of "trademark abuse." The implication is that HFS somehow violated the antitrust laws by not offering a perpetual license of HFS trademarks to Valley, Savannah, Procter & Gamble, Dial, and any other soap maker that could meet reasonable quality standards. Again we are not persuaded.

The main precedent on which Valley relies for its trademark abuse argument is *Siegel v. Chicken Delight,* 448 F.2d 43 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172,

1173, 31 L.Ed.2d 232 (1972), a case decided by the Ninth Circuit more than a quarter of a century ago. (The Areeda treatise suggests that this is one of a group of older cases that no longer constitute "reliable guides in the tying area." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 511.1 (Supp.1992).)

The *Chicken Delight* suit was brought by certain franchisees (counterparts of the hotel/motel operators that are conspicuous by their absence from the list of litigants in the case at bar) against a fast food franchisor that required all franchisees to buy cooking equipment, dry-mix food items, and trademarked paper packaging from the franchisor itself. *Id.* at 46. Analogizing the Chicken Delight trademark to a patent or copyright, the Ninth Circuit concluded that the license to use the trademark in the operation of a fast food store was a tying product with sufficient "market power" to bring the case within the Sherman Act. *Id.* at 49–50. And in holding as a matter of law that there could be no justification for requiring franchisees to buy trademarked paper packaging from the franchisor, the Ninth Circuit observed that "[o]ne cannot immunize a tie-in from the antitrust laws by simply stamping a trademark symbol on the tied product—at least where the tied product is not itself the product represented by the mark." *Id.* at 52.

*Chicken Delight* ignores the obvious differences between patents and trademarks—a patented product is necessarily unique, for one thing, while a trademarked product is not—and the extent to which *Chicken Delight* remains good law in the Ninth Circuit is open to question. See *Mozart Co. v. Mercedes–Benz of North America, Inc.*, 833 F.2d 1342, 1346 (9th Cir.1987), *cert. denied*, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988), where, without even mentioning *Chicken Delight* in this connection, the court held that "a prestigious trademark is not itself persuasive evidence of [the] economic power [that is necessary to make a tying arrangement illegal *per se* under the antitrust laws]."

Other courts have been more emphatic in rejecting the approach followed in *Chicken Delight.* A recent example is *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3rd Cir.1997), a case where the second largest pizza company in the United States was sued by franchisees who challenged the legality of restrictions that enabled the franchisor (Domino's) to sell approximately 90 percent of the ingredients and supplies—half a billion dollars' worth—used by Domino's franchisees. Notwithstanding that each franchisee's annual costs for ingredients and supplies were alleged to have been somewhere between $3000 and $10,000 more per year than they would have been in a competitive market, the Third Circuit affirmed a dismissal of the plaintiffs' antitrust claims under Rule 12(b)(6), Fed.R.Civ.P.

One of the claims in *Domino's* was remarkably similar to that advanced (although not by any franchisee) in the case at bar. This was a claim that "Domino's Pizza, Inc. imposed an unlawful tie-in arrangement by requiring franchisees to buy ingredients and supplies 'as a condition of their continued enjoyment of rights and services under their Standard Franchise Agreement.'" The Third Circuit dismissed the claim out-of-hand as "meritless." *Id.* at 443.

The *Domino's* court rested its decision on relevant market considerations, without expressly addressing the issue of "trademark abuse." We do not believe that the court could have reached the result it did, however, had the court thought that Domino's—which, as we have seen, was accused of doing essentially the same thing that HFS is accused of doing—was guilty of trademark abuse. We are in basic agreement in the approach followed in *Domino's,* and we reject Valley's contention that its loss of business was a direct result of "trademark abuse" that violated the Sherman Act.

■ Valley stresses the fact that before the HFS Preferred Vendor Program was implemented, Valley "was an *existing* competitor and participant in the relevant market." The suggestion is that this circumstance not only gives Valley a particularly strong incentive (stronger than any incentive the franchisees might have) to challenge the legality of the HFS program, but may make the antitrust injury rule inapplicable to Val-

ley, even if the rule would bar a plaintiff that had never been a market participant.

As to the first point, we agree that Valley appears to have a stronger incentive to litigate than the HFS franchisees do. If antitrust injury were not an essential part of antitrust standing, perhaps Valley would have standing to sue. But the case law makes it very clear that antitrust injury *is* a necessary component of antitrust standing, and the fact that Valley might have been able to survive the motions for dismissal if the law were otherwise seems rather cold comfort from Valley's perspective.

As to the second point, it is true that the *Axis* opinion left open the possibility that an actual competitor could "perhaps" have stated a claim for damages and injunctive relief against the corporate takeover which the plaintiff sought to challenge in that case. *Axis*, 870 F.2d at 1111. As we have seen, however, the plaintiffs in *Hodges*—who had been offering sightseeing tour and airport shuttle services in Nashville between 1986 and 1990, see *Hodges*, 26 F.3d at 37—appear to have been market participants in the same sense that Valley was. In principle, moreover, we see no reason for reading the antitrust laws as giving defendants greater freedom to exclude prospective market participants than to exclude existing market participants. The fact that Valley had once been one of two manufacturers authorized to sell soap marked with the Days Inn logo, like the fact that Valley subsequently became one of six manufacturers authorized to sell soap marked with that and other HFS logos, surely gave Valley no prescriptive right to use the logos in perpetuity.

The loss of business attendant upon cancellation of the vendor agreements was doubtless painful to Valley. But the antitrust laws, as the Supreme Court has repeatedly reminded us, "were enacted for 'the protection of *competition* not *competitors.*'" *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697, quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

■ Finally, because the antitrust laws are said to have "conflicting goals," Valley criticizes the district court for applying the antitrust injury rule mechanistically, "ma[king] no effort to balance the competing policies of the antitrust laws." In this connection Valley cites *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, 899 F.2d 951 (10th Cir.), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990), as a case that may help our understanding of how these conflicting policies ought to be accommodated here.

We do not read *Reazin* as converting the antitrust injury doctrine into some kind of balancing test. The principal plaintiff in *Reazin* was a hospital, Wesley Medical Center, that had been taken over by Hospital Corporation of America, a competitor of Blue Cross. Wesley claimed to be the victim of a conspiracy in which Blue Cross was said to have enlisted the aid of two other hospitals in "hurting" Wesley for the edification of other hospitals that might be tempted to link up with Hospital Corporation of America. In rejecting an argument that Wesley had failed to establish antitrust injury, the Court of Appeals explicitly recognized that such injury must be "demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation.…" *Id.* at 961, quoting *Alberta Gas Chems., Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1240 (3rd Cir.1987), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988).[4] Noting that the precise reason Blue Cross had undertaken to discipline Wesley was that Blue Cross perceived the hospital as a competitor, and observing further that "Wesley was the direct victim of Blue Cross' actions," the Tenth Circuit concluded that Wesley's injuries were an "integral aspect" of the conspiracy to restrain trade in the health care financing market. *Id.* at 963, citing *Assoc. General Contractors*, 459 U.S. at 529–30 n. 19, 103 S.Ct. at 904 n. 19 and *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484, 102 S.Ct. 2540, 2551, 73 L.Ed.2d 149 (1982). The *Reazin* court thus resolved the antitrust inju-

---

4. The *Reazin* court also cited the article at 37 Stan. L.Rev. 1445 by Professor Page—an authority dismissed by Valley as "a commentator well-known for his scepticism toward the economic validity of tying claims.…"

ry issue without any apparent effort to "balance" competing policies of the antitrust laws.

If we were to indulge in a balancing act here, it is by no means a foregone conclusion that the result would be favorable to Valley. In *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), on which Valley continues to rely heavily in its appeal notwithstanding the abandonment of the proposed amendment to the complaint, the Supreme Court held that tying arrangements in the replacement parts and service aftermarket for patented Kodak photocopying equipment might be unlawful despite Kodak's lack of economic power in the market for the original equipment.[5] But the factual situation in *Kodak,* as the Third Circuit demonstrated in *Domino's,* 124 F.3d at 439–40, is readily distinguishable from one that involves non-patentable supplies used by franchisees in a low-tech service industry, as opposed to unique parts used by the owners of patented high-tech copiers.

The *Domino's* court recognized that franchising has become "a bedrock of the American economy," with franchise outlets accounting for more than one-third of the total amount of money spent in retail transactions in the United States. *Id.* at 440–42. The myriad forms of alleged tying arrangements encountered in this industry do not seem to have prevented franchising from working successfully in practice, and the Third Circuit was obviously reluctant to let the antitrust laws be used to fix something that ain't broke, so to speak. Similar considerations would obviously have to be weighed in the balance if the antitrust injury rule were subject to waiver on policy grounds.

But we do not understand the Supreme Court to have told us that the antitrust injury requirement must be met only in selected cases. And because this panel is bound by the published decisions in *Axis* and *Hodges,* we have no more discretion to depart from the holdings of those cases than the district court did. Like the district court, we believe

that the *Axis/Hodges* principle required the dismissal of the plaintiffs' federal antitrust claims.

## III

Although Valley presented state law antitrust claims below, those claims have not been pursued on appeal. Valley does assert here, as it did in the district court, that its complaint set forth a justiciable common law claim for what it now calls "a tort that might be best described as 'interference with at-will business relationships.'" Valley also contends, as it did below, that its complaint stated a claim for treble damages under Tenn.Code Ann. 47–50–109, which provides as follows:

"It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages."

As to the statutory claim, the district court held, in reliance on *Oak Ridge Precision Industries, Inc. v. First Tenn. Bank Nat'l Ass'n,* 835 S.W.2d 25 (Tenn.App.1992), that a party which itself commits a breach of contract may not bring suit as the "injured" party under Tenn.Code Ann. 47–50–109. Valley does not challenge this proposition, evidently conceding that the stated principle is correct as far as it goes. Valley argues, however, that the district court overlooked an affidavit in which it was said that because of what HFS had done, "at least one distributor canceled an order that it had placed with Valley...." The implication is that Valley could sue HFS for a breach of contract committed by the distributor.

5. On remand, interestingly enough, the *Kodak* plaintiffs withdrew their § 1 tying claims and went to trial (successfully) on their § 2 monopolization and attempted monopolization claims only. See *Image Tech. Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1201 (9th Cir.1997).

The short answer, and a dispositive one, is that nowhere does the complaint allege that any distributor canceled an order in violation of any contract it may have had with Valley. A longer answer is that, as Valley itself acknowledges in its brief, "[t]he wrongdoer must have acted maliciously...." There is no allegation of malice here. On the contrary, the complaint negates any inference of malice by making it clear that HFS implemented its Preferred Vendor Program not because of any animosity against Valley, but because it sought to maximize its own revenues.

■ As to Valley's common law tort claim, the dismissal will be affirmed for essentially the same reasons given by the district court. See *Valley Products*, 877 F.Supp. at 1095. We would note in addition that HFS did nothing wrong in terminating, on 60 days' notice, a license that both parties had agreed would be terminable on 60 days' notice. We are not prepared to hold that HFS was somehow estopped to exercise its contractual right to terminate the license once Valley had begun selling logoed amenities to its distributors.

**AFFIRMED.**