*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0282p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NICSAND, INC.,

      *Plaintiff-Appellant,*

*v.*

3M COMPANY,

      *Defendant-Appellee.*

No. 05-3431

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-02619—Ann Aldrich, District Judge.

Argued: January 25, 2006

Decided and Filed: August 8, 2006

Before: SILER, SUTTON, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Dennis E. Murray, Jr., MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for Appellant. James P. Murphy, SQUIRE, SANDERS & DEMPSEY, Washington, D.C., for Appellee. **ON BRIEF:** Dennis E. Murray, Jr., MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for Appellant. James P. Murphy, SQUIRE, SANDERS & DEMPSEY, Washington, D.C., J. Philip Calabrese, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellee.

    COOK, J., delivered the opinion of the court, in which SILER, J., joined. SUTTON, J. (pp. 16-21), delivered a separate dissenting opinion.

---

## OPINION

---

    COOK, Circuit Judge. NicSand, Inc. (NicSand), a marketer of automotive abrasives, brought this antitrust action against its competitor, 3M Company (3M), alleging that 3M's execution of exclusive dealing contracts with four of the six largest distributors of such abrasives constituted attempted and unlawful monopolization under § 2 of the Sherman Act. The district court granted 3M's motion to dismiss on the ground that NicSand failed to allege an "antitrust injury," and NicSand timely appealed. We find that NicSand has sufficiently pleaded an antitrust injury to maintain its claims and accordingly we reverse the judgment of the district court.

1

I.

*Background*.  Prior to the allegedly anticompetitive conduct, NicSand converted and marketed DIY (do-it-yourself) retail automotive coated abrasives:  sandpaper, cloth sanding rolls, sanding discs, compounding paper, polishing discs, grinding discs, and finishing paper—all to be used in the preparation of automotive surfaces for painting.  NicSand did not manufacture the abrasives, but rather purchased the materials in bulk, cut them, and packaged them for the retail consumer.  3M is a manufacturing powerhouse; it was NicSand's only competing supplier of DIY retail automotive coated abrasives and now, in NicSand's absence, it is a monopolist of what NicSand alleges to be a distinct economic market.

The wholesale and retail markets for DIY retail automotive abrasives are small and highly concentrated.  For the relevant period, six "big box" retailers—Advance Auto Parts (Advance Auto); Autozone; CSK Auto Corporation (CSK); Kmart; Pep Boys; and Wal-Mart—accounted for 80% of retail sales.  In 1995, NicSand had a 67% share of the wholesale market, implying a total wholesale market size of $6 million, based upon NicSand's 1997 sales of approximately $4 million.[1]

The First Amended Complaint (Amended Complaint) identifies various barriers to entry for new suppliers.  First, five of the six "big box" retailers carried only one brand of DIY retail automotive coated abrasives at a time. (Pep Boys carried both NicSand and 3M abrasives.)  Second, for a supplier to induce one of these retailers to stock its abrasives instead of its competitor's, the supplier had to:  (1) purchase the retailer's current stock of abrasives;  (2) provide and install appropriate display racks for the marketer's product;  (3) supply a complete line of abrasives, with appropriate packaging for each subcategory of coated abrasive;  and (4) provide a discount on the retailer's first order.  Third, although the retailers were not contractually bound to stay with a particular supplier, retailers only considered changing suppliers once a year, during their "annual line review."  Fourth, for apparently all of the relevant period, 3M maintained a "wrap-around program" with Wal-Mart, under which the retailer received discounts from 3M conditioned upon purchasing a complete line of coated abrasives, including coated abrasives for preparation of both automotive and wood surfaces.[2]

*Alleged Anticompetitive Conduct*.  In 1997, 3M began a series of transactions that NicSand alleges ran afoul of § 2 of the Sherman Act, 15 U.S.C. § 2.  NicSand alleges that 3M's anticompetitive conduct consisted of 3M according large discounts (exceeding the typical first-order discounts) to DIY-retail-automotive-coated-abrasives retailers in return for multi-year exclusive dealing agreements.  Though NicSand devotes substantial attention to the magnitude of the discounts, the gravamen of the Amended Complaint is that 3M monopolized and attempted to monopolize the abrasives market through the exclusivity provisions of the contracts that the discounts accompanied.

Between 1997 and 2001, 3M secured exclusive contracts to provide DIY retail automotive coated abrasives to four of NicSand's customers:  Kmart, Advance Auto, CSK, and Autozone.  The discounts accompanying 3M's contracts constituted a sizeable portion of NicSand's annual sales and profits to each:

---

[1]The First Amended Complaint provides information on NicSand's 1999 sales to Autozone, 1997 sales to Advance Auto and CSK, and 1996 sales to Kmart.  Together, these sales totaled approximately $3.4 million.  We assume that NicSand sold $600,000 of abrasives through other channels.

[2]NicSand does not allege that the wrap-around program itself constituted unlawful anticompetitive conduct. (3M wrongly reads NicSand's brief to suggest that it does. *See* Appellee's Br. 22-23.)  Rather, NicSand makes clear in its reply brief that its allegations concerned only 3M's exclusive dealing contracts with the other five large retailers, and that the wrap-around program with Wal-Mart simply provided a context for the alleged illegality.  Reply Br. 11-12.

1.  In 1997, 3M executed a contract with Kmart that included a $300,000 discount. Given NicSand's 1996 sales to Kmart of $475,000 and profits of $180,000, the discount represented 63% and 167% of NicSand's sales and profits, respectively.

2.  In 1998, 3M executed a contract with Advance Auto that included a $285,000 discount. Given NicSand's 1997 sales to Advance Auto of $550,000 and profits of $272,000, the discount represented 52% and 105% of NicSand's sales and profits, respectively.

3.  In 1998,  3M executed a contract with CSK that included a $200,000 discount. Given NicSand's 1997 sales to CSK of $369,000 and profits of $164,000, the discount represented 54% and 122% of NicSand's sales and profits, respectively.

4.  In 2000, 3M executed a contract with Autozone that included a $1,000,000 discount (spread over 2001 and 2002).  Given NicSand's 1999 sales to Autozone of $2,200,000 and profits of $865,000, the discount represented 23% and 58% of NicSand's sales and profits, respectively.

The Amended Complaint offers little more on the nature of the exclusive contracts. NicSand has made no allegations regarding the contracts' terms and only indirect allegations as to what portion of the relevant market the exclusive contracts foreclosed.  Nonetheless, it is possible to draw certain conclusions from the allegations.  The complaint notes that sales by the six largest retailers accounted for 80% of the retail market and that 3M executed exclusive contracts with four—leaving only Wal-Mart (which was subject to the wrap-around program) and Pep Boys as possible distributors for NicSand's products.  NicSand thus alleges that through the exclusive contracts 3M locked up business with two-thirds of the retailers that together supplied 80% of the retail market. Assuming that each of the six retailers accounted for an equal share, this change would have increased 3M's (retail) market share from 20% to 73% (assuming that NicSand and 3M split the Pep Boys's business evenly), a change of 53%.  And even with the more conservative assumption that Pep Boys accounted for twice the volume of sales of any of the others, 3M's market share would have increased from 23% to 69%, a change of 46%.

With NicSand left only to supply Pep Boys (and to share that business with 3M), NicSand alleges that it was no longer able to take advantage of economies of scale, either in its purchases of raw materials or in its own production processes.  NicSand also alleges it lost sales on abrasives-related products, such as dust masks, and was forced to seek bankruptcy protection in 2001. NicSand's departure left 3M as the only supplier to the six largest retailers.

*Litigation History*.  NicSand filed the original complaint in this matter on December 30, 2003, alleging that 3M had unlawfully monopolized and attempted to monopolize the market for "retail automotive sandpaper." (J.A. 7.)  That market apparently included professional-grade as well as DIY automotive abrasives, as the original complaint listed additional retailers beyond the six large distributors of DIY retail automotive coated abrasives mentioned above. 3M moved to dismiss NicSand's claims on the grounds that: 1) NicSand failed to allege antitrust injury; 2) NicSand failed to allege a relevant product market; and 3) 3M's alleged conduct was pro-competitive and thus lawful.

In response, NicSand filed the Amended Complaint on April 15, 2004, which changed the alleged product market from "retail automotive sandpaper" to "DIY retail automotive coated abrasives" and reduced to four (Kmart, Advance Auto, CSK, and Autozone) the retailers with whom 3M had executed unlawful exclusive contracts. 3M then moved to dismiss this complaint on the same three grounds asserted before.

On March 1, 2005, the District Court granted 3M's motion to dismiss. The court concluded that NicSand failed to plead an injury that supported standing under the Sherman Act.

II.

"This court reviews de novo a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6)." *Care Heating & Cooling, Inc. v. Am. Std., Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005). "In reviewing a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiffs and determine whether the plaintiffs undoubtedly can prove no set of facts in support of the claims that would entitle them to relief." *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002). "The issue is whether the complaint states a claim under the Sherman Act, assuming the factual allegations to be true and indulging to a reasonable degree a plaintiff who has not yet had an opportunity to conduct discovery." *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999). Although we employ a "liberal system of 'notice pleading,'" *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993), requiring the plaintiff only to make "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), the essential elements of the plaintiff's claim "must be alleged in more than vague and conclusory terms" in order to survive a Rule 12(b)(6) motion. *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 530 (6th Cir. 2001).

There are two distinct issues raised by this appeal: first, whether NicSand has alleged conduct prohibited by the antitrust laws; and second, whether NicSand, according to its allegations, suffered sufficient "antitrust injury" by way of that conduct to be a proper plaintiff for its claims. We address the issues in this order.

A. Alleged Conduct

1. Sherman Act § 2

Section 2 of the Sherman Act, 15 U.S.C. § 2, proscribes monopolization, attempted monopolization, and combinations and conspiracies to monopolize; NicSand alleges only monopolization and attempted monopolization.

> A claim [of monopolization] under § 2 of the Sherman Act requires proof of two elements: (1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to "growth or development resulting from a superior product, business acumen, or historic accident."

*Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985)). "To establish the offense of monopolization a plaintiff must show that a defendant either unfairly attained or maintained monopoly power." *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir. 1986). "Monopoly power consists of 'the power to control prices or exclude competition,'" *Conwood,* 290 F.3d at 782 (quoting *Potters Med. Ctr.*, 800 F.2d at 574), but de minimis control over prices is insufficient to sustain a claim. Nearly every supplier of a distinctive (non-commodity) product has some power over prices, thus "monopoly power," in the sense interesting to antitrust law, is "a term that properly connotes a degree of control over price and output that far exceeds the minimal market power possessed by most sellers of nonfungible goods and services." Richard A. Posner, *Antitrust Law* 22, 195-96 (2d ed. 2001) (hereafter "Posner").

The elements of a claim for *attempted* monopolization are slightly different, because often the defendant only acquires the requisite monopoly power by way of the unlawful practice. "[I]t is

generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a *dangerous probability* of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (emphasis added). The "power component," a "dangerous probability of achieving monopoly power," is "normally measured through an analysis of market share." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 807a (2004 Supp.) (hereafter "Antitrust Law 2004"). And the "specific intent component," which is more burdensome than the "general intent" a plaintiff must show in a "completed" monopolization claim, *Conwood*, 290 F.3d at 782, may nonetheless be discerned objectively. We presume that "'no monopolist monopolizes unconscious of what he is doing' . . . [and that] '[i]mproper exclusion (exclusion not the result of superior efficiency) is always deliberately intended.'" *Id.* (quoting *Aspen Skiing*, 472 U.S. at 602-03) (alteration in original).[3] The Sixth Circuit has thus said that "an attempted monopolization [under § 2] occurs when a competitor, [1] with a dangerous probability of success, [2] engages in anti-competitive practices [3] the specific design of which are, to build a monopoly or exclude or destroy competition." *Smith v. N. Mich. Hosps., Inc.*, 703 F.2d 942, 954 (6th Cir. 1983).

### 2. Exclusive Dealing Claims

"In its simplest form, an exclusive dealing arrangement is a contract between a manufacturer and a buyer forbidding the buyer from purchasing the contracted good from any other seller, or requiring the buyer to take all of its needs in the contracted good from that manufacturer."[4] Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1800a (2d ed. 2002) (hereafter "Antitrust Law 2002"). Because exclusive dealing contracts are *contracts* that restrain *competition*, antitrust claims against them are typically cast as violations of § 1 of the Sherman Act, 15 U.S.C. § 1 (proscribing contracts, combinations, and conspiracies in restraint of trade), or § 3 of the Clayton Act, 15 U.S.C. § 14 (forbidding exclusive dealing that substantially lessens competition). Nonetheless the logic of treating exclusive dealing claims under the Sherman Act's § 2, which is concerned with *monopolization*, is clear:

> When an upstream dominant firm imposes exclusive dealing on distributors or dealers, the latter are disabled from selling any competitors' version of the same product. . . . To the extent alternative dealers are unavailable or entry into dealing is difficult, such arrangements impair the opportunities of rivals or may raise their costs. *Thus, although § 2 problems should not be presumed, they can emerge when it becomes clear that the exclusive dealing has the effect of strengthening or prolonging the dominant firm's market position.*

Antitrust Law 2002 ¶ 760b7 (emphasis added); *accord LePage's, Inc. v. 3M*, 324 F.3d 141, 157 (3d Cir. 2003) ("Even though exclusivity arrangements are often analyzed under § 1, such exclusionary conduct may also be an element in a § 2 claim."). Exclusive dealing may enable a firm to move into a position of dominance that allows it to restrict market output and raise prices. *See* Posner 229 ("[W]here there are . . . large economies of scale in distribution, . . . [t]he effect [of exclusive dealing arrangements] is to increase the scale necessary for new entry, and [thus] increase the time required for entry and hence the opportunity for monopoly pricing."). Monopolization through exclusive dealing is unlawful because it enables a party to attain that position of dominance not by offering "a superior product, business acumen, or historic accident," *Conwood*, 290 F.3d at 782 (citation

---

[3]*But see United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("[I]n considering whether the monopolist's conduct on balance harms competition and is therefore condemned as exclusionary for purposes of § 2, our focus is upon the effect of that conduct, not upon the intent behind it. Evidence of the intent behind the conduct of a monopolist is relevant only to the extent it helps us understand the likely effect of the monopolist's conduct.").

[4]In this latter formulation, exclusive dealing contracts are referred to as "requirements contracts."

omitted),**5** but by raising its rivals' distribution costs by eliminating their access to downstream markets.**5**

The complexity, however, is that a downstream distributor—a necessary party to the exclusive dealing arrangement—has no interest in helping one of its suppliers achieve a monopoly by erecting barriers to entry for lower cost rivals. A distributor's profits increase with the volume of goods it distributes and the difference between the wholesale and retail price of each good. Thus the last thing a distributor wants is to be subject to a monopolistic supplier that can raise prices (a *cost* to the distributor) or restrict output. When a supplier seeks an exclusive contract from the distributor, we should expect the distributor to demand terms that compensate it for the possibility that the contract will enable the supplier to secure a monopoly.

> Once the [supplier] achieves a monopoly, the distributor will be at his mercy unless the terms of his contract with the [supplier] prevent the latter from later charging him a monopoly price or compensate him for the future exactions. But if the distributor obtains such terms, the [supplier] will gain nothing from having excluded his competitors.

Posner 230. With one important caveat, distributors will not acquiesce to the establishment of an upstream monopoly, and the establishment of a monopoly cannot be the purpose of the exclusive dealing.**6**

The reason that a series of exclusive dealing contracts may be anticompetitive is that distributors, in agreeing to the terms of such contracts, may fall victim to a collective action problem. An individual distributor may agree to an exclusive dealing contract with one supplier but—on the assumption that other distributors will continue to patronize other suppliers and thus prevent the first supplier from forming a monopoly, or on the fear that it will be the only distributor that does not take advantage of the offered discount—not demand a discount that accurately reflects the possibility of future supracompetitive prices. *See* Posner 231. Distributors by their individual acts might thus enable the formation of an upstream monopoly (or, more precisely, an upstream

---

**5**Exclusive dealing claims thus differ from exclusive *distribution* claims, which allege that a party has unlawfully committed to distribute its product through only one or more "authorized" distributors, often in a particular geographic area. *See Care Heating & Cooling, Inc.*, 427 F.3d at 1008 (challenge by an "unauthorized" seller/servicer against an equipment manufacturer and one of its "authorized" sellers/servicers); *CTUnify, Inc. v. Nortel Networks, Inc.*, 115 Fed. Appx. 831 (6th Cir. 2004) (challenge by phone training company against telecom equipment manufacturer and rival training company whose services manufacturer bundled with its products); *see also Paddock Publ'ns. v. Chicago Tribune Co.*, 103 F.3d 42, 46-47 (7th Cir. 1996) (contrasting exclusive dealing and exclusive distribution).

**6**It is on this basis that (in the Sherman Act § 1 context) exclusive dealing arrangements are not *per se* unlawful but are handled under the Rule of Reason—according to which courts examine whether a challenged practice has harmed competition. Antitrust Law 2002 ¶ 1820b. Indeed, in that inquiry, courts have articulated several reasons why exclusive dealing contracts might *promote* competition:

> In the case of the buyer, [exclusive dealing contracts] may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand. From the seller's point of view, [exclusive dealing] contracts may make possible the substantial reduction of selling expenses, give protection against price fluctuations, and -- of particular advantage to a newcomer to the field to whom it is important to know what capital expenditures are justified -- offer the possibility of a predictable market. They may be useful, moreover, to a seller trying to establish a foothold against the counterattacks of entrenched competitors.

*Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 306-07 (1949) (citations omitted); *accord Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) ("[C]ompetition for the contract is a vital form of rivalry, . . . which the antitrust laws encourage rather than suppress.").

monopoly capable of enjoying monopoly profits), despite their having a collective incentive not to do so. Exclusive dealing liability protects downstream parties from this possibility.

Whether a series of exclusive dealing contracts has allowed a supplier to unlawfully attain or maintain a monopoly can only be determined by reference to the particularities of the market and the terms of the exclusive contracts—including their durations and the magnitudes of the price discounts they provide.[7] (In particular, facts about the market and the contracts might indicate whether a collective action problem existed among the downstream distributors so as to make the exclusive dealing contracts truly anticompetitive.) Such details, however, are not necessary and seldom available at the pleading stage. At the pleading stage, an exclusive dealing plaintiff's obligations follow the general § 2 requirements: a plaintiff need only allege that the defendant (1) acquired or had a dangerous probability of acquiring monopoly power; (2) executed anticompetitive exclusive dealing contracts; and (3) possessed the specific intent to harm competition. *Conwood*, 290 F.3d at 782. Prerequisite to alleging monopoly power, the plaintiff must allege an economic market, but prior to discovery it need not "show[] market structure, power, and coverage of the exclusive dealing arrangement sufficient to create an inference of reduced and higher prices in the affected market." Antitrust Law 2002, ¶ 1820a.

### 3. NicSand Has Sufficiently Alleged Unlawful Conduct

We hold that NicSand has alleged conduct proscribed by § 2 of the Sherman Act. First, the Amended Complaint makes sufficient averments regarding monopoly power. Both the monopolization and attempted monopolization claims allege that 3M currently controls almost 100% of the market for DIY retail automotive abrasives and that the exclusive contracts directly allowed 3M to substantially increase its share. Second, the claims allege that 3M has acquired and attempted to acquire its monopoly power through anticompetitive conduct—specifically by providing substantial purchasing discounts to several large retailers in exchange for multi-year exclusive dealing arrangements. The Amended Complaint alleges that such discounts served no business purpose other than to exclude NicSand's products from the market, and that the effect of such exclusion was to raise NicSand's costs, to prevent it from competing effectively in the market, and eventually to bring about its bankruptcy. Third, the claims allege that 3M had the specific intent to monopolize the DIY retail automotive coated abrasives market when it undertook this course of conduct. The claims also allege that DIY retail automotive coated abrasives constituted an economic market for purposes of antitrust analysis.

The district court erred in holding that NicSand failed to claim an antitrust violation on the grounds that "3M's [alleged] behavior amounts to no more than surmounting the barriers to entry in order to compete in the sandpaper business." (Memorandum, J.A. 165.) The court accepted 3M's argument that the alleged conduct was precisely what NicSand (in the Amended Complaint) contended that the market required. As we have already said, however, nowhere in the Amended Complaint did NicSand claim that exclusive *contracts* were commonplace prior to 3M's conduct. The Amended Complaint alleges only that annual line reviews created "de facto exclusive

---

[7]The Areeda/Hovenkamp treatise articulates the prima facie case for exclusive dealing claims as follows:

> To succeed in its claim of unlawful exclusive dealing a plaintiff must [1] show the requisite agreement to deal exclusively and [2] make a sufficient showing of power to warrant the inference that the challenged agreement threatens reduced output and higher prices in a properly defined market. . . . [3] Then it must also show foreclosure coverage sufficient to warrant an inference of injury to competition . . . , depending on the existence of other factors that give significance to a given foreclosure percentage, such as contract duration, presence or absence of high entry barriers, or the existence of alternative sources of distribution or resale.

Antitrust Law 2002 ¶ 1821; *See also Microsoft*, 253 F.3d at 58-59 (articulating the prima facie case liability under § 2).

agreement[s]," (J.A. 59), and that retailers carried a single brand of DIY retail automotive coated abrasives at a time but without any contractual obligation to do so. For all that is known at this stage in the litigation, 3M might have secured five- or ten-year deals with the retailers, for no business purpose other than to drive NicSand from the market. Such arrangements would be a far cry from NicSand's account of previous market norms.

3M is also wrong to suggest that in order to withstand a motion to dismiss a plaintiff must make allegations regarding the terms or conditions of the exclusive contracts or the precise fraction of the wholesale market that such contracts foreclosed. NicSand needed only to make a short and plain statement of facts that, if true, would support a claim for relief. Fed. R. Civ. P. 8(a). NicSand claimed that the contracts directly made 3M the exclusive supplier to four of the six largest distributors and eventually gave 3M control of almost 100% of the wholesale market. NicSand also alleged that such contracts went beyond what the industry previously required and had the purpose and effect of harming competition.

Similarly, NicSand need not have alleged that 3M engaged in predatory pricing or that its conduct has already caused wholesale prices to increase. Predatory pricing and exclusive dealing are distinct offenses under antitrust law, and there is no requirement that price increases be alleged in order to survive a motion to dismiss. In fact, the *smaller* the price discounts accompanying the exclusive dealing contracts, the more we might believe that a collective action problem exists among retailers, because then it is less likely that the terms of the contracts reflect the possibility of monopoly pricing in the future.[8] And indeed a firm may act monopolistically even when prices remain stable—if such stability occurs in spite of falling costs.

Finally, NicSand has alleged a product market with sufficient reference to substitute products to survive a motion to dismiss. 3M cites *Queen City Pizza, Inc., v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) for the rule that:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

Finding that NicSand "improperly excluded [from its alleged market] numerous substitutable and interchangeable abrasive and finishing products immediately available in the marketplace," (Appellee's Br. 38), 3M contends that dismissal was appropriate.[9]

We do not read *Queen City Pizza* to establish so heavy a burden at the pleading stage. The court acknowledged that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Id.* And all that the opinion requires of plaintiffs is to propose (in their complaint) a market "*with reference to* the rule of reasonable interchangeability." *Id.* (emphasis added). Because we find that NicSand's Amended

---

[8] It is notable that the magnitude of the discounts (measured as a percentage of NicSand's sales) declined as 3M locked up a progressively larger share of the distribution market. That is, as 3M seemed more likely to attain a monopoly position, the downstream distributors demanded progressively smaller discounts—perhaps because they expected NicSand to exit the market and hoped to assure themselves of some discount (and not be the only one of the distributors not to have done so) before none was available. Discovery would shed light on whether this apparent decline in discounts did in fact indicate the presence of such a collective action problem.

[9] Finding other grounds for dismissal, the district court did not address the sufficiency of NicSand's market allegations.

Complaint does refer to the rule of interchangeability, we conclude that dismissal would have been inappropriate on that basis.

Specifically, the Amended Complaint alleges that DIY retail automotive coated abrasives are not interchangeable with either wood abrasives (abrasives for wood surfaces) or professional automotive coated abrasives when one considers the quality, price, packaging, and distribution channels of each, as well as the raw materials that each requires. The Amended Complaint first alleges that automotive abrasives are distinguishable from wood abrasives in their use of waterproof glues and in their distribution channels. Wood abrasives have no need for waterproof glues because the sanding of wood surfaces (unlike the sanding of automotive surfaces) does not generate enough heat to melt the paint on the sanding surface. And automotive abrasives are typically sold at automotive parts stores, whereas wood abrasives are sold at home improvement centers. The Amended Complaint then alleges that DIY automotive abrasives are distinguishable from professional automotive abrasives because the latter employ higher quality raw materials and are thus up to 500% more expensive. And professional abrasives, unlike DIY abrasives, are packaged in bulk (up to 100 sheets per package, as opposed to three to ten sheets per package for retail abrasives) and are not cut to fit consumer sanding tools. Finally, the Amended Complaint points out that 3M's website recognizes DIY retail automotive coated abrasives and professional abrasives as distinct products.

3M's most compelling criticism of NicSand's alleged market is that it fails to account for the possibility of *supply* substitution—the likelihood that new suppliers (for example, current suppliers of professional abrasives) will enter the market for DIY abrasives in the event that 3M, as a putative monopolist, attempts to raise prices or restrict output. Both supply substitution and demand substitution (consumers switching to other products in response to a price increase) factor into the ultimate definition of an economic market. *See Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1410-11 (7th Cir. 1995). And if, for example, on a motion for summary judgment, NicSand does not put forth facts supporting its alleged market that account for the possibility of supply substitution, its claims will have to be dismissed. We decline, however, to uphold the dismissal of NicSand's complaint at the pleading stage on this basis. *Queen City Pizza* requires only that a plaintiff plead a market "with reference to the rule of reasonable interchangeability," 124 F.3d at 436, and the possibility of supply substitution may be best assessed after some measure of discovery. Notably, NicSand will bear much of the cost of discovery on the issue of supply substitution (which may include expert market analysis but little in the way of document requests from the defendant) as the litigation proceeds.

## B. Antitrust Standing

### 1. Generally

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides standing to sue for damages to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." Though "'[a] literal reading of the [antitrust statutes] is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation,'" the Sixth Circuit has noted that "Congress clearly intended the Sherman Act to be construed in light of common law rules that historically had imposed significant limits on the right to recover damages in contract or tort." *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 403 (6th Cir. 1997) (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529 (1983)). "The antitrust injury doctrine is one such constraint." *Id.*

In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, the Supreme Court held that to have standing in an antitrust action for damages, "[p]laintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes

defendants' acts unlawful." 429 U.S. 477, 489 (1977).**[10]** The purpose of this limitation, and of other standing limitations in antitrust cases, was articulated by the Sixth Circuit in *HyPoint Technology, Inc. v. Hewlett-Packard Co.*:

> Antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws. The requirement of antitrust standing ensures that antitrust litigants use the laws to prevent anticompetitive action and makes certain that they will not be able to recover under the antitrust laws when the action challenged would tend to promote competition in the economic sense. Antitrust laws reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect.

949 F.2d 874, 877 (6th Cir. 1991).

Because the antitrust laws were enacted for "the protection of competition, not competitors," *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962), standing questions frequently arise in cases brought by one competitor against another—for example, where one firm challenges a merger between two of its rivals, *see Cargill*, 479 U.S. 104, or challenges a rival's "unilateral" practice such as exclusive dealing, tying, or predatory pricing.

> Whenever the plaintiff and consumers have divergent rather than congruent interests, there is a potential problem in finding "antitrust injury." If, as in *Brunswick* itself, the plaintiff and the defendant are competitors, the plaintiff gains from higher prices and loses from lower prices -- just the opposite of the consumers' interest. When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust.

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986).

As potentially problematic as competitor standing may be, courts regularly allow competitors to bring § 2 claims. *See, e.g.*, *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451 (1992) (assuming standing in a competitor's challenge to a tying arrangement) (cited in Antitrust Law 2002 ¶348d3, n.41); *LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (rival's § 2 challenge of bundled discounts and exclusive dealing arrangements); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789-91 (6th Cir. 2002) (rival's § 2 challenge of physical destruction of displays of plaintiff's products); *see also Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000) ("[A]ntitrust actions may, of course, be initiated by marketplace competitors."). Whether the plaintiff is a consumer or competitor is but one of many factors we consider to determine standing. Those factors include:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

---

**[10]**It held later, in *Cargill, Inc. v. Monfort of Colorado, Inc.*, that antitrust injury is also required of plaintiffs seeking injunctive relief under § 16 of the Clayton Act. 479 U.S. 104, 113 (1986).

*Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983) (citing *Associated Gen. Contractors of Cal.*, 459 U.S. at 537-49).  And no single factor is determinative. *Indeck Energy Servs., Inc.*, 250 F.3d at 976 (citing *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 846 (6th Cir. 1990)).

### 2. Competitor Standing for Exclusive Dealing Claims

In certain circumstances, a firm injured by a rival's execution of a series of exclusive dealing contracts has standing to sue for antitrust violations.  The Areeda/Hovekamp treatise states the rule categorically: "a rival has clear standing to challenge the conduct of rival(s) that is illegal precisely because it tends to exclude competitors from the market," Antitrust Law 2002, ¶ 348a, and, concerning exclusive dealing claims, "[w]hen one manufacturer unlawfully agrees with customers that they will not patronize rival suppliers, the rivals have undoubted standing to sue." *Id.* at ¶ 348d3.  The justification for competitor standing in exclusive dealing cases is not that exclusive dealing liability exists for the benefit of competitors.  It is rather that when unlawful exclusive dealing occurs, competitors are efficient advocates of consumers' (or, as in this case, downstream distributors') interests:

> [I]n several instances granting standing to rivals serves antitrust policy.  This is true particularly when:
>
>> (a) the rival is in a position to detect a violation earlier than consumers are: or
>>
>> (b) the rival's injury is large, while the injuries of individual consumers are likely to be very small or *the consumers have collective action problems making their suit cumbersome or less likely.*

*Id.* ¶ 348a (emphasis added).  As discussed above, exclusive dealing liability corrects for the inability of downstream parties to act collectively to prevent the formation of an upstream monopoly.  The same collective action problem—as well as the difficulty that downstream parties may have to detect unlawful conduct before prices rise—justifies competitor standing in exclusive dealing cases.

We conclude that dismissal was improper because NicSand's claims support an inference that, even as a competitor, NicSand is an efficient advocate of the downstream distributors' interests.  We have already held that NicSand's substantive allegations of exclusive dealing suffice to survive a motion to dismiss.  And while we do not adopt the categorical rule that all such exclusive dealing claims support competitor standing, we hold that competitor standing is appropriate in exclusive dealing cases where the competitor is in a position to detect a violation earlier than consumers or where collective action problems may plausibly prevent downstream parties from bringing such claims.  In this case, NicSand alleged that 3M, through a series of exclusive dealing agreements that served no business purpose other than to exclude NicSand from the market, succeeded in raising NicSand's costs to the point were it was forced to leave the business.  This effect, a necessary though not ultimate step towards the consumer injury that exclusive dealing liability is designed to prevent, was apparent to NicSand before it was to the downstream parties.  In addition, inasmuch as we have held that NicSand's substantive allegations suggest the possibility of a collective action problem among the downstream distributors (the only way that exclusive dealing could be anticompetitive), we believe that the downstream distributors are unlikely to bring a suit on their own.  We suspect that antagonizing 3M would undermine a distributor's chances of receiving discounts on DIY retail automotive abrasives in the future, and may harm a distributor's relationship with 3M across an entire range of products.  Rather than risk such consequences, each distributor may chose to absorb the price increases that 3M is likely to impose as a monopolist of the alleged

market. Competitor standing corrects for this possibility. Allowing NicSand to pursue its claims vindicates legitimate interests that the downstream distributors are either unwilling or unable to pursue themselves.

### 3. The Necessary Predicate Test and *Indeck Energy Services*

3M nonetheless contends that as the Sixth Circuit has articulated the antitrust injury doctrine, NicSand has no standing to bring its exclusive dealing claims. 3M points us to the "necessary predicate" test in *Valley Prod. Co. v. Landmark*, 128 F.3d 398, 404 (6th Cir. 1997) (following *Hodges v. WSM, Inc.*, 26 F.3d 36, 39 (6th Cir. 1994)), and the later precedent of *Indeck Energy Services v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000).

*The Necessary Predicate Test.* The court in *Valley Products* held that in order to survive a motion to dismiss, antitrust plaintiffs must "'allege . . . that the illegal antitrust conduct was a necessary predicate to their injury or that defendants could exclude plaintiffs only by engaging in the antitrust violation.'" 128 F.3d at 404 (quoting *Hodges*, 26 F.3d at 39). The plaintiff in the case was a soap manufacturer that historically sold logo-bearing "guest amenities" to hotel and motel franchisees of the defendant, Hospitality Franchise Systems, Inc. (HFS). When HFS's "Preferred Vendor Program" prevented its franchisees from purchasing amenities from all but two vendors (neither of which was Valley Products), Valley Products sued. The court applied the necessary predicate test and held that Valley Products had not suffered injuries sufficient to support antitrust standing. The conduct alleged by Valley Products was not a necessary predicate to its injury because "[t]he loss of logoed amenity sales suffered by Valley upon cancellation of its vendor agreement flowed directly from the cancellation . . . ; the sales losses would have been suffered as a result of the cancellation whether or not HFS had entered into the alleged tying arrangements with the franchisees." *Id*. at 403.

*Valley Products* followed *Hodges*, in which the plaintiffs operated an airport shuttle and tour bus service and wished to offer shuttle service between the Nashville airport and Opryland (an amusement park, hotel, and convention center). The defendants, owners of both Opryland and their own tour company, Grand Old Opry Tours, agreed to rent buses from tour companies other than the plaintiffs' in exchange for a promise from those companies not to transport passengers to Opryland. The owners of Opryland then excluded from their property the buses of all other companies. The plaintiffs challenged the agreement and the exclusion, but the court dismissed their claims for want of antitrust standing. The plaintiffs' injuries, it held, did not result from the defendants' allegedly unlawful effort to limit competition, but from "defendants' lawful refusal to grant plaintiffs access to their private property." *Hodges*, 26 F.3d at 39. As in *Valley Products,* the court held that the plaintiffs had not suffered an antitrust injury because their injury could have occurred in the absence of an antitrust violation.[11]

3M contends that because "[NicSand's] claimed injury arises out of the lawful termination of its supplier relationship by its customers[,]" and because "[the company] would have suffered the same alleged injuries as the result of its customers' termination regardless of whether 3M had engaged in anticompetitive conduct," the alleged antitrust violation was not a necessary predicate to NicSand's injury. (Appellee's Br. 20.) In short, 3M maintains that because the harm inflicted on NicSand by the exclusive contracts could have been brought about by the distributors' voluntary conduct, the allegedly unlawful exclusive contracts did not inflict antitrust injury upon NicSand.

---

[11]The court in *Hodges* drew from the earlier case of *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir. 1989), which denied standing to a firm challenging a merger of one of its rivals with a downstream patent holder. The plaintiff complained that the transaction harmed competition because the merged entity was likely to limit the plaintiff's access to the downstream firm's patents. Because the downstream firm might have lawfully limited the plaintiff's access even absent the merger, the court held that the merger did not cause the plaintiff antitrust injury.

It is no exaggeration to say that this formulation of the antitrust injury doctrine would preclude all private antitrust suits challenging contracts to engage in otherwise lawful conduct that violate the antitrust statutes precisely because they are contracts. For this reason we significantly limited the necessary predicate test in *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896 (6th Cir. 2003). The plaintiffs in that case were direct and indirect purchasers who sued a drug manufacturer for agreeing to pay a competitor (Andrx) $40 million per year to delay its introduction of a generic version of one of the manufacturers' drugs. The defendants argued that their allegedly unlawful contract was not a necessary predicate to plaintiff's injury because in the absence of the contract Andrx could have lawfully delayed entry. The court rejected this defense. In its view, "[t]he fact that Andrx could have unilaterally, and legally, decided not to bring its generic product to a manifestly profitable market ha[d] no relevance in assessing whether the plaintiffs adequately alleged that the antitrust violation was the necessary predicate for their injury." *Id.* at 915. Moreover, it said:

> [T]he defendants' position, if adopted, risks undermining a basic premise of antitrust law that, as the district court observed, in many instances, an otherwise legal action—*e.g.* setting a price—becomes illegal if it is pursuant to an agreement with a competitor. Under the defendants' view, such an action would never cause antitrust injury because a defendant *could* have unilaterally and legally set the same price.

*Id.* at 915 n.19.

The panel did not consider itself to have overruled the necessary predicate test because in none of the relevant precedents—*Axis*, *Hodges*, or *Valley Products*—"was a complaint dismissed for failure to allege antitrust injury based on a defendant's claim that it *could* have caused the same injury without committing the alleged violation." *Id.* at 914. Rather, claims were only dismissed under the necessary predicate test "where it ha[d] been apparent from the face of the complaint that actual and unequivocally legal action by the defendant *would* have caused plaintiff's injury, even if there had been no antitrust violation." *Id.* (emphasis added). Finding "nothing on the face of the complaint that suggest[ed], much less establishe[d] as a matter of law, that there was any physical or 'impenetrable' legal impediment to Andrx's production and sale of its FDA-approved generic product," *id.*, the court held that the plaintiffs had alleged unlawful conduct that was a necessary predicate to their injuries.[12]

NicSand's claims satisfy the necessary predicate test because it is not "apparent from the face of the complaint that actual and unequivocally legal action by [3M] would have"—as opposed to *could* have—"caused [NicSand's] injury, even if there had been no antitrust violation." *Id.* The complaint alleges that the exclusive agreements induced Kmart, Advance Auto, CSK, and Autozone to change suppliers from NicSand to 3M. The complaint does not make it "apparent" that the distributors would have switched in the absence of those agreements. The complaint also alleges that on the basis of the exclusive contract with 3M, Kmart forbid NicSand to "quote on DIY retail automotive coated abrasives" for a "few years." (J.A. 59 (emphasis omitted).) Not only was it not apparent from the complaint that this would have occurred in the absence of the exclusive agreement, but also it would have been unlikely for Kmart to take such a step—to refuse even *to*

---

[12]The court dismissed the defendants' contention that Andrx would have delayed its entry in the absence of the alleged antitrust violation in order to avoid damages in a pending patent infringement suit (by the other defendant). That possibility "merely raise[d] a disputed issue of fact that [could not] be resolved on a motion to dismiss." *Id.* at 900. It did not undermine the plaintiffs' standing because the complaint did not establish that Andrx was certain to delay entry on account of the pending litigation. In fact, as the court noted, some plaintiffs alleged that the patent infringement suit was a sham. *Id.* at 914. Far from it being "apparent" from the complaint that the same injury would have occurred in the absence of the antitrust violation, the complaint included affirmative allegations that Andrx would have entered the market (and thereby prevented the alleged injury) were it not for the alleged antitrust violation.

*hear* a supplier's offer—in the absence of a commitment that it do so. Last, NicSand's claims do not fail the necessary predicate test because NicSand might have—or even would have—been similarly injured by *lawful* exclusive dealing agreements. As we held above, NicSand sufficiently alleged that 3M's exclusive dealing agreements were unlawful. Whether they were is the ultimate issue in the case. Discovery may show that the agreements were of limited duration, that they did not have an anticompetitive effect (perhaps because no collective action problem existed among the distributors), or that DIY retail automotive coated abrasives do not comprise a distinct economic market. But NicSand's complaint should not be dismissed because there is a possibility that its claims will not prevail.

We conclude that the necessary predicate test does not require the dismissal of NicSand's claims.

*Indeck Energy Services.* 3M's final contention is that NicSand lacks standing according to the Sixth Circuit case of *Indeck Energy Services, Inc. v. Consumers Energy Co.*, 250 F.3d 972 (2000). Indeck was a developer of "co-generation systems," which generate electricity and thermal energy for large commercial and industrial customers. Indeck had agreed with General Motors to develop co-generation systems for two of GM's plants and had undertaken extensive preparations for their construction. Consumers Energy then executed a contract with GM to be the exclusive power supplier for five to ten years to twenty of GM's plants—including the two that Indeck had been preparing to supply. Consumers Energy offered GM an across-the-board discount if GM agreed to include both Indeck plants in the deal. Indeck also alleged that Consumers Energy executed similar exclusive contracts with seventeen other large industrial/commercial customers, which, together with the GM contract, represented over 80% of the alleged market. Indeck sued to enjoin the exclusive agreement with GM but was denied standing.

The court did not refer to the necessary predicate test, but rather focused on how *directly* the alleged violation had brought about Indeck's injury. The court noted that "'the Sixth Circuit . . . has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of antitrust laws, flows directly from conduct that is not itself an antitrust violation.'" *Indeck Energy Servs.*, 250 F.3d at 976 (quoting *Valley Prods.*, 128 F.3d at 403). Because the antitrust laws protect competition, and because Indeck's injury was not tied to an injury to competition, the court concluded that Indeck had no standing for its claims:

> [T]he only harm allegedly suffered by Indeck was in the company's capacity as a competitor in the marketplace, not as a defender of marketplace competition. Although antitrust actions may, of course, be initiated by marketplace competitors, those actors in the economic forum must at least allege that exclusion of the competitor from the marketplace results in the elimination of a superior product or a lower-cost alternative. The record in this appeal presents no indication that *competition* itself was harmed by any act of the defendants. Consequently, the antitrust damages alleged by Indeck are too indirect and speculative to justify assertion of federal antitrust jurisdiction over this matter.

*Id.* at 977. 3M contends that NicSand lacks standing because it has alleged only injuries to itself, and not to the market as a whole, such as "the elimination of a superior product or a lower-cost alternative." *Id.*

NicSand, however, has alleged that 3M's exclusive dealing agreements brought about the elimination of a superior product. The Amended Complaint asserts that NicSand acquired and maintained its market share by offering superior service and a greater variety of products than its competitors. (J.A. 56.) It also alleges that following NicSand's elimination from the market the

"selection [of abrasives] has decreased substantially." (J.A. 70.) Indeck, by contrast, supplied only commodity products—power and thermal energy—and thus could not claim that the market became less diversified because of Consumers Energy's allegedly unlawful conduct. And because Consumers Energy had offered GM a substantial across-the-board discount, Indeck could not claim that the market had lost a lower-cost alternative.

But a more fundamental feature distinguishes *Indeck* from this case. Indeck's injuries arose from a single exclusive dealing agreement with a single downstream party, GM, whereas NicSand's injuries arose from a series of such agreements with several distributors. Indeck had not competed to supply any of the seventeen other industrial/commercial customers with whom Consumers Energy had secured exclusive contracts. *See Indeck Energy Servs., Inc. v. Consumers Energy Co.*, Case No. 97-CV-10366-BC (E.D. Mich. March 31, 1999). Thus Indeck's injuries would have been the same regardless of whether Consumers Energy had executed a single contract with GM (and continued to compete lawfully with other independent power producers for contracts with the other seventeen customers), or executed a series of such contracts, unlawfully "locking up" 80% of the market, as Indeck alleged. The court correctly emphasized that an antitrust plaintiff's injury must constitute—or at least plausibly be describable as—an injury to competition, and not merely a consequence of it. *Indeck Energy Servs.*, 250 F.3d at 977. Because Indeck was injured merely by the loss of business to one customer, it could not claim that its injuries stemmed from *anticompetitive* conduct. Nothing about its injury reflected the anticompetitive threat that Consumers Energy's allegedly unlawful conduct posed.

NicSand, in contrast, was 3M's only competing supplier of DIY retail automotive coated abrasives, and its alleged injuries did not stem from the loss of a single downstream distributor but rather from the accumulated effect of 3M's contracts with the bulk of the downstream parties. NicSand alleges that the series of exclusive dealing contracts raised NicSand's costs by preventing it from taking advantage of various economies of scale and ultimately caused its business to fail. NicSand's injuries in 1997, after 3M executed its first exclusive contract (with Kmart), were comparable to those that formed the entire basis for Indeck's suit. But NicSand's injuries diverged from Indeck's following the series of transactions by which 3M allegedly attempted to monopolize and monopolized the market. At some point, NicSand suffered not simply as a single competitor in the market, but as proxy for all competitors, and thus for all competition. We need not decide at what point this occurred. If there is *ever* to be competitor standing in exclusive dealing cases—if ever a competitor can suffer an injury that allows it to be an efficient advocate for the interests of downstream parties—it must occur where a series of exclusive dealing contracts allegedly brings about the elimination of the only other competitor in a market.

We conclude that *Indeck* provides no basis for this court to affirm the dismissal of NicSand's claims.

III.

We hold that the Amended Complaint alleges conduct that violates § 2 of the Sherman Act and antitrust injury sufficient to support standing for NicSand's claims. Accordingly we reverse the judgment of the district court.

---

**DISSENT**

---

SUTTON, Circuit Judge, dissenting. Ordinarily, I would agree with the majority that the Rule 12(b)(6)-stage of this matter counsels in favor of permitting the litigation to proceed beyond the pleading stage. But antitrust standing is a pleading-stage inquiry and when a complaint by its terms fails to state a cognizable claim of antitrust injury we must dismiss it as a matter of law—lest the antitrust laws become a treble-damages sword rather than remain the shield against competition-destroying conduct that Congress meant them to be. "Antitrust standing," it bears repeating, "is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws." *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991).

That is why this court frequently has required the dismissal of antitrust actions at the pleading stage due to lack of standing—due in other words to the claimant's failure to show that it suffered a cognizable antitrust injury. *See Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000); *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 406 (6th Cir. 1997); *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 846 (6th Cir. 1990); *Dry v. Methodist Med. Ctr., Inc.*, 893 F.2d 1334 (6th Cir. 1990); *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1352 (6th Cir. 1989); *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 90 (6th Cir. 1989); *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989); *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1088 (6th Cir. 1983); *see also N.W.S. Mich., Inc. v. Gen. Wine & Liquor Co.*, 58 Fed. Appx. 127, 129 (6th Cir. 2003); *Park Ave. Radiology Assocs., P.C. v. Methodist Health Sys.*, No. 98-5668, 1999 U.S. App. LEXIS 29986, at *8–9 (6th Cir. Nov. 10, 1999). In this instance, because "the injury and damages" suffered by NicSand do not "match the rationale for finding [an antitrust] violation," *HyPoint Tech.*, 949 F.2d at 879—but indeed flow from the kind of competition that the antitrust laws were designed to foster—it has not established a cognizable injury.

As this case comes to the court, it presents a most unusual candidate for antitrust protection. The case, to begin with, involves a claim by one competitor against another and thus implicates the classic rejoinder that the antitrust laws protect competition, not competitors. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (noting that the antitrust laws are "concern[ed] with the protection of *competition*, not *competitors*").

When courts nonetheless have permitted one competitor to deploy the antitrust laws against another, that typically has been because one of them—usually, the larger competitor—has engaged in some form of predatory pricing or illegal tying. *See, e.g.*, *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 697–98 (1967) (predatory pricing); *Int'l Bus. Machs. Corp. v. United States*, 298 U.S. 131, 137–40 (1936) (illegal tying); *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 921 (6th Cir. 2005) (predatory pricing); *LePage's, Inc. v. 3M*, 324 F.3d 141, 155 (3rd Cir. 2003) (illegal tying); *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1125 (6th Cir. 1981) (illegal tying). But here NicSand (the smaller competitor) concedes that 3M has not engaged in any form of predatory pricing and makes no allegations about any form of illegal tying.

Stranger still, NicSand's "monopolization" claim seeks treble damages for its loss of a corner on this market and its loss of 40–50% profit margins on sales of automotive sandpaper. According to the allegations in NicSand's amended complaint, the retail market for do-it-yourself automotive sandpaper in 1997 consisted primarily of six large retailers—Advanced Auto, Autozone, CSK, KMart, Pep Boys and Wal-Mart—which made up 80% of the retail market for the sandpaper. And the wholesalers to this large-retailer market consisted of just two players—NicSand and 3M. In 1997 (and for several years before that), Wal-Mart sold 3M sandpaper, Pep Boys sold NicSand and

3M sandpaper, and the four other large retailers sold NicSand sandpaper. Before 3M's alleged misconduct, NicSand acknowledges that it controlled 67% of the entire market and sold its sandpaper at approximately 40–50% over cost.

Between 1997 and 2000, 3M entered into contracts to supply automotive sandpaper to Advanced Auto, Autozone, CSK and KMart and did so at prices ranging from 10% to 30% over NicSand's costs. But nothing about this sequence of events suggests an antitrust violation. As to the market share that 3M garnered over these years, "it takes one to know one" is hardly an accredited hallmark of antitrust liability—particularly when NicSand's apparent solution to this problem is not to encourage the entry of other suppliers to this lopsided market but to preserve its 67% market share. As to 3M's discounting, NicSand of course has no right—under the antitrust laws no less—to preserve 40–50% margins on a product that (so far as the allegations are concerned) does not take any ingenuity to make. One can fairly doubt the size of NicSand's and 3M's R&D departments for automotive sandpaper.

Unable to argue that 3M's discounting amounted to anything but legitimate (and apparently long-overdue) competition, NicSand focuses on the fact that 3M entered into *exclusive* contracts with the four large retailers that switched from NicSand to 3M. Yet according to NicSand's amended complaint, the *retailers* made exclusivity one of the preconditions for doing business with a new supplier. The complaint says that the large retailers (1) choose to carry just one brand of automotive sandpaper for sale to consumers, (2) re-negotiate these one-brand contracts just once a year, (3) require a new supplier to purchase the retailer's existing supply of automotive sandpaper, (4) require a new supplier to provide racks and other display equipment, (5) require a new supplier to produce a full line of automotive sandpaper and (6) require a new supplier to provide a discount on the retailer's first order. NicSand of course complied with these requirements in obtaining the supply business it held in 1997, and 3M complied with them in winning some of that business away. If retailers have made supplier exclusivity a barrier to entry, one cannot bring an antitrust claim against another *supplier* for complying with that precondition. Put another way, NicSand did not sue 3M insisting that it had a right to share shelf space; it sued 3M because it wanted that shelf space all to itself—just as it had it in 1997. This is precisely the kind of all-for-one-and-all-for-one competitor claim that the antitrust laws do not protect.

There being no right under the antitrust laws for NicSand to preserve a 67% market share, there being no right to preserve its 40–50% margins, there being no impermissible discounting or other predatory pricing by 3M and there being no right to prohibit 3M from entering into exclusive contracts, NicSand picks up the only arrow left—the *length* of 3M's exclusive contracts. What NicSand decries, then, is not so much that 3M entered into exclusive contracts with these four retailers but that it did so for more than one year.

As an initial matter, several ambiguities cloud this last remnant of a tenable complaint: How long are these exclusive contracts? And who demanded them—the retailers or 3M? All that the complaint says is that they will last "several years." It never says whether that amounts to two to three years or three to five, whether each of the four contracts has the same term and what the termination provisions are under each contract. Even then, the only factual allegation supporting the "several years" premise is that NicSand approached one of the large retailers (KMart), and it said that "it would be a few years before NicSand would again be allowed to quote" the retailer on sandpaper. JA 59. NicSand complains that it cannot resolve this ambiguity without discovery, but it never explains how it determined the prices the retailers paid 3M in these deals or why the large retailers (as opposed to 3M) would not disclose the terms of these deals in hopes of encouraging NicSand to offer still better terms.

Given everything else in the complaint showing that the large retailers held the bargaining power in this market, it makes perfect sense to assume that the retailers either insisted on the

"several years" terms or that they at least welcomed them. And why not: having paid NicSand prices generating 40–50% margins for NicSand, one can well imagine why the retailers would be eager to lock in far better prices with 3M for several years rather than just one. Of course, if the retailers demanded or welcomed this term, any claim would have to be brought against them, not 3M. But even if we give NicSand considerable leeway in reading its complaint—by assuming that 3M insisted on including this term in the contracts and by assuming that "several years" last three to five years—that still does not establish a cognizable antitrust injury.

As a competitor, NicSand undoubtedly was injured by these contracts. It had business that was lost, and it would not be able to win that business back for three to five years. But to survive a motion to dismiss, NicSand not only had "to show injury-in-fact and proximate cause," but also had "to allege . . . antitrust injury." *Louisiana Wholesale Drug Co. v. Hoechst Marion Roussel, Inc.* (*In re Cardizem CD Antitrust Litig.*), 332 F.3d 896, 909–10 (6th Cir. 2003). An "injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anticompetitive aspect of the practice under scrutiny, since it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Atl. Richfield Co. v. United States Petroleum Co.*, 495 U.S. 328, 334 (1990) (internal quotation marks and brackets omitted).

While exclusive contracts in some instances may create impermissible barriers for new entrants to a market and may permit a supplier to charge monopoly prices, NicSand has not claimed—and cannot tenably claim—that it suffered these anticompetitive effects. NicSand's economic injuries plainly did not result from antitrust injuries in the nature of high entry barriers to the market. Before 1997, after all, NicSand controlled 67% of the market, and used the existing barriers to entry—annual contracts and exclusive shelf space—to *preserve* its lock on the market. From 1997 to 2000, when 3M competed for and won the contracts with the four large retailers formerly supplied by NicSand, the barriers to entry caused by exclusive dealing still existed, and were gradually enhanced as the contracts went from a de facto annual term to a "several years" term. Through all of this, however, the critical point is that NicSand was not a potential entrant; it was the market leader. Yet NicSand offers no explanation why it could not have competed for "several years" term contracts or why (in view of its high margins) it could not have won those contracts by matching 3M's discounts. As the market leader, NicSand was on the inside looking out, and for whatever reason the company chose not to compete with 3M for these contracts.

This alleged barrier to entry thus did not exist when 3M came to KMart (then NicSand's customer) with its "several years" offer in 1997. Nor did it exist when 3M came to CSK and Advance Auto in 1998. And in 2000, when NicSand had only one of the big box retailers remaining, it still controlled over 40% of the market due to the sheer size of its business with Autozone. Yet still 3M successfully competed for the contract. While NicSand eventually declared bankruptcy in 2001, it offers no explanation (and makes no allegations) regarding any efforts before then to recoup the business from KMart (which entered the 3M contract in 1997) or from CSK or Advance Auto (which entered the contracts in 1998). Nor does 3M's size make a difference to the disposition of these allegations. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–88 (1977) ("Yet respondents' injury . . . bears no relationship to the size of . . . its competitor[]. Respondents would have suffered the identical loss—but no compensable injury—had the acquired centers instead . . . been purchased by shallow pocket parents . . . . Thus, respondents' injury was not of the type that the statute was intended to forestall.") (internal quotation marks omitted). In the end, NicSand simply has not alleged facts establishing that the "several years" term of the 3M contracts created market-entry barriers that caused *it* a cognizable antitrust injury.

NicSand's injury also does not stem from 3M's alleged monopolization of the market. For most of the time NicSand was losing business, it still controlled a majority or at least a plurality of the market. NicSand never alleges that it suffered from monopoly prices imposed by 3M or from

any other underhanded monopolist tactic. While NicSand appears to complain about the discounts that 3M offered, it does not allege that 3M was selling below cost, and the numbers that NicSand itself offers demonstrate that the prices 3M offered were comfortably over NicSand's costs. While NicSand's losses may have propelled 3M into a dominant market position, its injury does not correspond to any allegedly anticompetitive effect on the market, but rather a truly competitive one. Even if 3M were to begin charging higher prices (presumably at the end of the "several years" contract), it is hard to believe that these prices would exceed the 40–50% profit margins that NicSand enjoyed during its market dominance.

Any doubt about the appropriate resolution of this case, it seems to me, can be laid to rest by *Indeck Energy Services v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000). There an energy supplier (Indeck) alleged that a competitor (Consumers Energy) violated the antitrust laws by signing an exclusive supply contract with General Motors for a period of five to ten years. *Id.* at 975. The contract came on the heels of similar contracts with "17 other large industrial/commercial customers," through all of which Consumers Energy "succeeded in excluding competition from over 80 percent of the Relevant At Risk Market." *Id.* Central to the resolution of that case, as to this one, was that "the only harm allegedly suffered by Indeck was in the company's capacity as a competitor in the marketplace, not as a defender of marketplace competition." *Id.* at 977. There has been "no indication," the court emphasized, "that competition itself was harmed by any act of the defendants. Consequently, the antitrust damages alleged by Indeck are too indirect and speculative to justify assertion of federal antitrust jurisdiction over this matter." *Id.* Even if Indeck "were able to establish the preemption from the relevant market that it asserts," the court added, "it has failed to allege how such acts have injured competition, especially in light of the discounted rates offered to the customers, in light of the fact that the exclusive contracts were of limited duration, and in light of the fact that the customers were free to seek other [providers] at the conclusion of the contracts." *Id.* at 977–78.

*Indeck*, it would seem, was the harder case. Consumers Energy controlled a larger percentage of the market (80%) than 3M does. (Recall that 3M did not control all of the large-retail market because it shared shelf-space with NicSand at Pep Boys stores, and NicSand has not alleged that 3M supplies any of the 20% of the market not controlled by the large retailers.) Consumers Energy entered into longer exclusive contracts (5–10 years) than 3M ("several years"). And Consumers Energy did not unseat the dominant market leader (like 3M did) but hindered a potential market entrant. Indeck was hardly a dominant supplier of energy, as it provided cogeneration services (recycling factory waste to create energy), which diminish a customer's need for traditional energy rather than supply such energy. Indeck, in short, was more akin (far more akin) to a market entrant than NicSand.

The majority maintains that *Indeck* can be distinguished on the ground that today's case involves a series of contracts with several retailers as opposed to several contracts with one retailer. As a result, the majority submits, while Indeck's harm resulted only from competition, NicSand "suffered not simply as a single competitor in the market, but as a proxy for all competitors, and thus for all competition." Maj. Op. at 15. But this seems to invert the relative vices and virtues of the two fact patterns. While NicSand originally held all of the contracts with the retailers in question and lost them to competition, Indeck lost out on a single contract and alleged that it found itself in a market where a single dominant firm controlled 80% of the market with exclusive contracts of 5 to 10 years with all of the major industrial and commercial customers. If the harm to the market is the entry barriers established by "exclusive contracts," it is Indeck, not NicSand, that makes the better proxy for injury to competition in the market rather than harm to a competitor. NicSand had the opportunity to compete for each of the contracts whereas Indeck never had that opportunity because of the *existing* exclusive contracts. Nonetheless, we concluded in *Indeck* that there was no harm to competition because Indeck "failed to allege how [the exclusive contracts] have injured competition, especially in light of the discounted rates offered to the customers, in light of the fact

that the exclusive contracts were of limited duration, and in light of the fact that the customers were free to seek other [providers] at the conclusion of the contracts." 250 F.3d at 977–78. We rested our decision on these grounds, and these grounds control us here—with NicSand, if anything, having the less compelling complaint. When one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury. *See* Herbert Hovencamp, *Antitrust Law: an Analysis of Antitrust Principles and Their Application*, 11 Antitrust Law ¶ 1823(b) (2005) ("Clearly not a victim of antitrust injury is the exclusive dealing partner whose business relationship was terminated in favor of a different exclusive dealing partner.").

The majority next maintains that *Indeck* can be distinguished on the ground that 3M's exclusive dealing arrangements have eliminated a superior product, noting that NicSand allegedly provides a better variety of products and better service than 3M. *Indeck*, it is true, noted that antitrust actions by marketplace competitors "must at least allege that exclusion of the competitor from the marketplace results in the elimination of a superior product or a lower-cost alternative" because these developments might show "that competition itself was harmed by an[] act of the defendants." 250 F.3d at 977. But the court still rejected Indeck's claim even though the company had alleged that its competitor's conduct caused the market to become less diversified because Indeck provided "alternative sources of electrical power," namely thermal power, whereas its competitor supplied only traditional electrical power. *Id.* at 975. As *Indeck* suggests, then, diversity of products by itself will not sustain a claim. NicSand by its own admission was not providing a lower-cost alternative. And the unelaborated claim that NicSand provided better service to the retailer—an allegation that could be made in any case, even one involving pure commodities—does not alone demonstrate that "competition itself was harmed."

Even aside from *Indeck*, the majority maintains that "a series of exclusive dealing contracts may be anticompetitive" because the "distributors, in agreeing to the terms of such contracts, may fall victim to a collective action problem." Maj. Op. at 6. In its view, this collective action problem—that no retailer will accept the higher prices of one supplier in order to keep competition in the supply market when all the other retailers are accepting lower prices from a potentially emergent monopolist supplier—"justifies competitor standing in exclusive dealing cases." *Id.* at 23.

What we have here, however, is not a "collective action problem" but collective-action sanity. If all that one can say about a supplier is that it has offered lower prices (though not predatory prices) to a series of retailers, and that the existing monopolist refuses to match those prices, a retailer would have far more questions to answer for refusing, than for accepting, this better deal. The entities with power in this market by the terms of NicSand's complaint were not the suppliers but the retailers. It was these retailers after all who initially demanded exclusivity in the market for automotive sandpaper, only reviewing their choice of a single supplier once a year. That they have now signed longer exclusive agreements for much better prices not only does not establish a market failure but shows the retailers' bargaining authority at work, to say nothing of adherence to their duties to consumers and shareholders. Why not enter a multi-year contract for a steep discount on the prices that NicSand was charging? That helps the retailers and bodes well for consumers to boot. *See Indeck*, 250 F.3d at 977 ("No allegation in the complaint indicates in any manner whatsoever how [the retailer] itself was harmed or how other [retailers] suffered by agreeing to [an exclusive] agreement with a lower bidder for such [product].").

All of this is not to say that no potential competitor may bring an antitrust claim for exclusive dealing. Should 3M use its exclusive contracts and current market dominance in the future to establish unreasonable barriers to entry, a potential competitor might have a legitimate antitrust claim. *See Standard Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346 (1922) (finding an antitrust violation where a dominant market power used exclusive contracts with retailers to create excessively high barriers to prospective entrants). But that does not mean that an entrenched market leader can complain about alleged barriers to entry that were imposed through legitimate

competition—the most conspicuous result of which was NicSand's loss of 40–50% margins, which it apparently needed to stay in business. Nor is this to say that the future competitiveness of the market lacks protection if 3M chooses to impose monopolist prices down the road. Aggrieved retailers would have standing to sue for treble damages if that occurred. *See Indeck*, 250 F.3d at 977 ("[A]s the direct victim of the alleged antitrust violation in this regard, [the retailer] could prosecute its own cause of action should it deem the actions of [the supplier] inappropriate.").

But, at this point, to allow this litigation to continue is to allow one monopolist to sue a competitor for seizing its market position by charging less for its goods. In *Indeck*, we concluded that "[t]he record in this appeal presents no indication that competition itself was harmed by any act of the defendants. Consequently, the antitrust damages alleged by Indeck are too indirect and speculative to justify assertion of federal antitrust jurisdiction over this matter." 250 F.3d at 977. The same is true here. NicSand took advantage of the very same exclusivity it now attacks to charge prices that made it vulnerable to 3M's offers in the first place. If and when 3M does the same, it will expose itself either to competition (much like NicSand) or to a legitimate antitrust complaint from retailers or excluded competitors. But until then, as the district court rightly concluded, there has been no antitrust injury and NicSand has no antitrust standing to bring this case. The majority seeing these issues differently, I respectfully dissent.